[No. D019194. Fourth Dist., Div. One. Nov. 2, 1993.]

ERRECA'S, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
CALLE RYAN HOMEOWNERS ASSOCIATION et al., Real Parties in
Interest.

[No. D019248. Fourth Dist., Div. One. Nov. 2, 1993.]

BARRY STONE & ASSOCIATES, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
CALLE RYAN HOMEOWNERS ASSOCIATION et al., Real Parties in
Interest.

1480

---

**COUNSEL**

McInnis, Fitzgerald, Rees & Sharkey, Timothy S. Thomas, Jeff G. Harmeyer, Shifflet, Walters, Kane & Konoske, Gary P. Sinkeldam, Bacalski & Byrne, A. Daniel Bacalski, Jr., and Richard D. Gloger for Petitioners.

No appearance for Respondent.

Duke, Gerstel, Shearer & Bregante, Robert K. Goff, J. Michael Reed, Dawn R. Brennan, Klinedinst, Fliehman, McKillop & Jones, Klinedinst, Fliehman & McKillop, Donald R. McKillop, Sr., Michael Castellaneta, Gray, Cary, Ames & Frye, Robert A. McGregor, Kenneth S. Klein and Bryan M. Garrie for Real Parties in Interest.

## OPINION

**HUFFMAN, J.**—The issues raised by these petitions focus our attention upon the two competing policies established by Code of Civil Procedure sections 877 and 877.6, which govern "the effect that a settlement agreement has on a settling defendant's potential liability to other defendants for contribution or comparative indemnity" (*Abbott Ford, Inc.* v. *Superior Court* (1987) 43 Cal.3d 858, 871-872 [239 Cal.Rptr. 626, 741 P.2d 124]) (hereafter *Abbott Ford*): (1) The equitable sharing of costs among the parties at fault and (2) the encouragement of settlements. (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 494-496 [213 Cal.Rptr. 256, 698 P.2d 159] [hereafter *Tech-Bilt*].)[1] In these consolidated petitions for writ of mandate, Erreca's and Barry Stone & Associates (Stone), as nonsettling defendants, challenge certain aspects of the trial court's order granting approval of a good faith settlement between plaintiffs Calle Ryan Homeowners Association (HOA) and homeowner class representatives (collectively plaintiffs) and the developers of their single-family homes, Spyglass Venture, Greens Associates, MRL, Inc., Patrick Construction Corporation, and Glenfed Development Corporation (developers). In particular, the nonsettling defendants (Erreca's, the grader on the project before the developers acquired the real property, and Stone, the original seller of the real property to the developers)[2] challenge the structure of the settlement reached which allocates $1.5 million, along with $300,000 for assignment of indemnity rights, to the soils aspect of the dispute. The remainder of the $6.8 million settlement was allocated to nonsoils issues, including construction and landscaping defect allegations.

The nonsettling defendants, who are primarily charged with creating soils defects, first contend that the settlement agreement inadequately defines the soils versus nonsoils categories of liability and does not present the trial court with enough information at the settlement approval proceeding for good faith analysis of that allocation. In a subsidiary argument, the nonsettlors contend that the $300,000 value attributed to the developers' assignment to the plaintiffs of their indemnity and contribution rights against the soils defendants, as part of the settlement package, was inadequate, and that the value of such an assignment of rights should be more closely related to the potential recovery it represents (here, $1.5 million, or the soils portion of the settlement).

In their other chief argument, the nonsettling defendants contend that the trial court improperly adopted a special master's recommendation that only

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

[2] A third nonsettling soils defendant, Southern California Soils and Testing (So. Cal. Soils), served as the soils engineer. It opposed the good faith settlement motion below but has not appeared in these writ proceedings.

$500,000 be granted as a setoff or credit against any judgment which the plaintiffs ultimately might be able to recover, and that the setoff should be for a greater amount, i.e., $1.5 million, the amount allocated in the settlement to soils problems (and possibly an additional $300,000 for the assignment of indemnity rights).

In addition to the above issues, Stone's petition adds due process deprivation arguments concerning the procedure which was used for the negotiation and approval of the good faith settlement, arguing that the allocation and credit amounts were unfairly reached in proceedings in which Stone was not represented.

As we will explain, we first conclude the trial court was justified in approving the settlement insofar as the parties allocated portions of the settlement to soils and nonsoils problems, since there was an adequate evidentiary basis for that distinction and the allocation was reached in settlement negotiations that were sufficiently adverse to raise a presumption that a reasonable allocation was made. (*Abbott Ford, supra*, 43 Cal.3d at p. 879.) We also find no fault with the special master's evaluation, adopted by the trial court, of the value of the assignment of indemnity rights at $300,000, and substantial evidence supports the trial court's approval of the good faith settlement in that respect. However, the trial court and special master were not justified in undervaluing at $500,000 the amount of credit to be accorded the nonsettling soils defendants as against any judgment the plaintiffs might obtain, where the settlement agreement clearly allocated three times that much to the soils problems, as well as $300,000 for assignment of indemnity rights against the remaining nonsettling defendants. We conclude the trial court was not justified in making an evaluation of comparative fault to reduce the amount of credit given for soils issues from the total amount of consideration given by the developers in the settlement package for those issues, because *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 604 [146 Cal.Rptr. 182, 578 P.2d 899] indicates that section 877 does not allow such an approach. Accordingly, we grant the petition for writ of mandate with directions to the trial court to set aside the good faith settlement approval unless the credit amount is set at $1.8 million, the only amount supported by this record.

## FACTUAL AND PROCEDURAL BACKGROUND

This action arises out of the development of a residential subdivision consisting of 106 single-family homes in Encinitas, California, the Spyglass Project. In 1983, Stone owned the tract of land where the project is located. One of the component entities of the developers, the Greens Associates,

agreed to purchase the property from Stone, and the purchase and sale agreement reached required Stone to construct 106 finished residential lots on the property. Stone hired Erreca's to perform the grading, and the remaining soils defendant, So. Cal. Soils, served as the soils engineer. Escrow on the sale of the property closed March 13, 1984.

On June 19, 1984, Spyglass Venture (Spyglass), another of the constituent parts of the developer, entered into a general construction agreement with Patrick Construction Corporation (Patrick) to construct the homes on the property. Patrick in turn subcontracted the work to numerous subcontractors. The work was completed in three phases by December 1986. The homes were sold to members of the public between 1985 and 1987.

This action is a representative action by the HOA and a class action representing 88 of the homeowners. (§§ 374, 382.) The complaint alleges claims for construction defects against the developers on theories of strict liability, breach of warranty, and negligence. Plaintiffs amended their complaint in March 1992 to include Stone, Erreca's, and So. Cal. Soils as Doe defendants. The plaintiffs sought recovery for various types of damages attributable to the negligent grading and filling of the developed lots, as well as damages caused by the defective construction of residential structures. Costs of repair and diminution of value in stigma damages or loss of value were alleged.

Parallel investigations of the plaintiffs' claims were undertaken, and the parties entered into settlement negotiations, with the assistance of court-appointed special master Michael Duckor. The plaintiffs' preliminary cost of repair estimate totaled $14,668,789. The developers' consultants estimated the cost of repair of the residences and common areas at $1.5 million. Plaintiffs then made a settlement demand of $8.5 million, with $6.5 million of that figure to be attributable to the construction of residential structures (the nonsoils claims) and $2 million for damages arising from the grading operation (the soils claims).

Eventually, settlement agreements were reached between plaintiffs, the developers, and a number of subcontractors, design professionals and material suppliers involved in the construction of the residential structures and common areas, referred to here as the additional contributors. The only parties who did not join in the settlement were Stone, Erreca's and So. Cal. Soils, the parties responsible for grading and development of the lots. In pertinent part, conditioned upon court approval pursuant to section 877.6, the settlement agreement provides as follows:

*The Settlement Payment.* The developers will pay the plaintiffs $5,403,500.

*Additional Contribution.* The additional contributors have agreed to pay the plaintiffs the total sum of $1,096,500.

*Assignment of Claims.* The developers shall assign to plaintiffs their claims for indemnity and contribution against Stone's, Erreca's, and So. Cal Soils. The developers and plaintiffs agreed that the value of the assigned claims is $300,000.

*Allocation of Settlement Payment, Additional Contribution, and Assigned Claims Among Issues.* For purposes of allocating the settlement payment, the additional contribution, and the assigned claims among issues, the case was severed into two parts: (a) the soils claims, and (b) the nonsoils claims. $1.5 million of the settlement payment was allocated to the settlement of the soils claims, as was the value of the assigned claims ($300,000). Of the developers' payment, $3,903,500 was allocated to the settlement of the nonsoils claims, as was all of the additional contribution.

*Definition of Soils and Nonsoils Claims.* For purposes of allocating settlement proceeds, the soils claims are defined as "the claims for damages arising out of the soils conditions present at the Spyglass Project" and the nonsoils claims are defined as "the claims for damages arising out of all conditions at the Spyglass Project, other than the soils conditions."[3]

*Credit to Nonsettling Defendants.* The developers' moving papers do not refer to any agreement reached between the parties concerning the amount of credit to be accorded the nonsettling defendants against any judgment in favor of plaintiffs they might ultimately suffer. However, the moving papers state that as the nonsettling defendants are not responsible for the nonsoils claims, the nonsettling defendants are entitled to a credit of the amount allocated to the soils claims.

Evidently, after a tentative settlement was reached, plaintiffs and the settling defendants appeared before Judge Midlam on June 3, 1993, on an ex parte application for resolution of settlement issues. The minutes for that hearing show that a number of clarifications were made by the court on specific paragraphs of a settlement document, but that the parties were sent to the special master for recommendations regarding allocations and credits to be made, as well as the value of the assignment of rights.

Thereafter, the developers filed in Judge Midlam's department a motion for determination of good faith settlement (§ 877.6) which provided the

---

[3]The settlement also makes certain allocations of settlement proceeds between the two sets of plaintiffs, the HOA and the class representatives, and further allocates settlement contributions between the developer defendant Spyglass and the construction defendant Patrick.

terms of the settlement including the amounts, the contribution of each party, the allocations of settlement funds between soils and nonsoils claims, the value of the assigned claims, and general reference to the amount of credit to be given to the nonsettling defendants. In addition to the developers' own motion, almost all of the additional contributors filed their own motions for determination of good faith settlement. In support of their motion, the developers submitted declarations by their attorney, by plaintiffs' attorney, and by a principal in the developers' firm, attaching exhibits of the underlying purchase and sale and construction contract. The developers also submitted a declaration by a geotechnical engineer regarding the soils problems at the lot, in which he estimated nine lots needed repairs costing between $175,000 and $200,000, and, in addition, a declaration by the developers' construction consultant, who estimated preliminary repair costs at $1,092,875 to $1,243,647, excluding hardscape and foundation repairs.

In the developers' attorney's declaration in support of the motion for good faith settlement, the assigned claims for indemnity were valued at $300,000, as a discounted amount from the $1.5 million potential entitlement of recovery from the soils defendants. The discount represented the cost to prosecute the claims, the probability of prevailing on them, and the likelihood of collecting on a judgment on the assigned claims. The cost to prosecute the claims was given only a minimal discount, while the probability of prevailing on the claims was given a larger discount, since it was thought to be likely that the plaintiffs as assignees would be able to prevail against Stone on a strict liability theory, while it would be less probable that they could prevail against Erreca's and So. Cal. Soils on a negligence theory. The likelihood of collecting on a judgment represented a substantial discount on the value of the assigned claims, since Stone was thought to be insolvent except for limited insurance coverage, which was contested. Recovery from Erreca's was thought to be speculative because of the various coverage defenses available to Erreca's insurers, such as a work performed exclusion, and So. Cal. Soils was uninsured and effectively judgment proof.

Erreca's and Stone filed opposition to the motion for approval of the settlement, in compliance with an order shortening time for such response to six days. So. Cal. Soils joined in the opposition. At that time, a large number of the additional contributors' own motions for good faith settlement approval had already been noticed and were apparently pending, and a number of other additional contributors' motions for settlement approval were scheduled for the same hearing date, June 18, 1993. In their opposition to the developers' motion, both Erreca's and Stone made reference to the other pending motions of the additional contributors, and expressed opposition to

the total settlement reached in the case.[4] In their opposition, both Erreca's and Stone argued that the amount allocated to the soils issues was inadequate, that the amount of credit given against any potential judgment obtained by plaintiffs was inadequate, and that the assignment of rights to the indemnity cause of action had been undervalued. Specifically, Erreca's argued that it should be given credit for the entire $6.5 million settlement, and that the $1.5 million figure for soils amount should be discounted only by a small amount to produce the valuation of the assignment of indemnity rights. Erreca's argued that the special master's recommendation regarding the soils allocation was conclusory and unsupported by evidence. In a declaration, an attorney for Erreca's argued that the value of the assigned claims should be set at $2 million, the same amount as plaintiffs' most recent settlement demand had estimated for soils. Both Erreca's and Stone's opposition noted that a number of the settling additional contributors had expressed disagreement with an allocation of their entire contributions to nonsoils issues. So. Cal. Soils' attorney's declaration pointed out that there was no written settlement agreement before the court, as only a summary of that agreement had been presented.

At oral argument, the court announced it would abide by the tentative ruling to approve the settlement as in good faith, and declined to hear oral argument "unless you've got something new to say. I mean, there is absolutely no law in this area. We know that. *Alcal [Alcal Roofing & Insulation* v. *Superior Court* (1992) 8 Cal.App.4th 1121 [10 Cal.Rptr.2d 844], discussing settlement guidelines] is the only case out there. There's no provision with regard to doing this. We are cutting new ground." The trial court noted that it had "thoroughly read and digested" the six-inch thick stack of papers submitted in connection with the good faith settlement motions, and further noted that "the Court has held a four-hour hearing on the issue of allocation and credits alone."

In ruling on the motion, the court adopted the amended recommendation of the special master, in which the special master first noted that he had presided over the case for more than one and one-half years, during which "virtually every nook and cranny of the project was reviewed and evaluated and expert evaluations as to the problems were presented" in mediation proceedings in which he had participated. The special master then made

---

[4]As we will explain, this petition for writ of mandate appears to be directed solely to the developers' motion for good faith settlement approval, and the trial court's order in the record is restricted to the developers' motion. However, the reporter's transcript shows that the court stated that all the pending good faith settlement motions were granted. There is some confusion about the scope of this writ petition; we confine our ruling to the developers' motion and the ruling thereon, since that is technically all that has been presented to this court.

recommendations as follows: (1) $1.5 million should be allocated to the soils issues; (2) the $1.5 million allocation to the soils issues should not be the same as the credit provided to the nonsettling defendants with respect to the soils issues, because "[i]t is my opinion, based on my work in this matter, that [developers] contributed a sum of money to the settlement greater than their likely ultimate actual liability vis-à-vis BARRY STONE and ERRECA's. . . . [I]f the relative responsibility between [the developers] and BARRY STONE and ERRECA's were litigated, SPYGLASS VENTURE would have a substantially lower ultimate exposure in this regard." The special master thus recommended that the credit to be given the nonsettling defendants with respect to the soils issues be limited to the sum of $500,000.

In his third recommendation, the special master set the valuation of the assigned claims at $300,000, based upon an estimation of the cost to prosecute the claims, the probability of prevailing on them, and the likelihood of collecting a judgment on the claims. The court explained that while recovery on an indemnity theory was likely against Stone on a strict liability theory, recovery against Erreca's and So. Cal. Soils on a negligence theory was less likely, as was any likelihood of collecting on a judgment. Stone and Erreca's both asserted coverage defenses and So. Cal. Soils was uninsured and likely judgment proof. The court thus granted the developers' motion for determination of good faith settlement and dismissed cross-complaints as requested. The order makes the finding that the settlement is appropriate and within the reasonable range of the proportionate share of liability of the settling defendants, satisfying the requirements of *Tech-Bilt, supra*, 38 Cal.3d 488. At the hearing, the court noted that the companion motions for good faith settlement by the additional contributors were also granted. (See fn. 4, *ante*.)

Erreca's and Stone individually filed petitions for writ of mandate challenging the trial court's order determining that the developers' settlement was in good faith. An order to show cause was issued, the cases consolidated, and the matter set for oral argument.

## DISCUSSION

In *Abbott Ford, supra*, 43 Cal.3d at pages 871-872, the Supreme Court outlined the two competing policies established by sections 877 and 877.6: (1) The equitable sharing of costs among the parties at fault and (2) the encouragement of settlements. (*Tech-Bilt, supra*, 38 Cal.3d at pp. 494-496.) It stated that section 877 makes it clear that these two goals are "inextricably linked. Section 877 establishes that a good faith settlement bars other defendants from seeking contribution from the settling defendant (§ 877,

subd. (b)), but at the same time provides that the plaintiff's claims against the other defendants are to be reduced by 'the amount of consideration paid for' the settlement (§ 877, subd. (a)). Thus, while a good faith settlement cuts off the right of other defendants to seek contribution or comparative indemnity from the settling defendant, the nonsettling defendants obtain in return a reduction in their ultimate liability to the plaintiff." (*Abbott Ford, supra*, 43 Cal.3d at pp. 872-873.) In *Abbott Ford*, the Supreme Court made it clear that, although a good faith settlement does not call for perfect or nearly perfect apportionment of liability, such a settlement must not be "grossly disproportionate to the settlor's fair share" in order to be approved by the court. (*Id.* at pp. 874-875.)

In *Alcal Roofing & Insulation* v. *Superior Court* (1992) 8 Cal.App.4th 1121, 1127 [10 Cal.Rptr.2d 844] (hereafter *Alcal*), the court ruled that a party seeking confirmation of a settlement must explain to the court and to all other parties not only who has settled with whom and for what dollar amount, but whether any settlement is allocated and how the allocation has been made between issues and/or parties, as well as describing and valuing any nonmonetary consideration included. (*Id.* at p. 1129.) Petitioners claim these *Alcal* criteria are too general and request us to set forth a more specific framework for the structure of a good faith settlement where nonsettling defendants remain in the action. Before examining that request, we first apply the established principles set forth in *Tech-Bilt, Abbott Ford*, and *Alcal* to the petitioners' specific complaints about this settlement, which we discuss separately.

I

*Soils/Nonsoils Allocation*

For purposes of allocating the settlement monies among issues, the settling parties severed the case into two parts: "(a) the claims for damages arising out of the soils conditions present at the Spyglass Project (the 'Soils Claims'), and (b) the claims for damages arising out of all conditions at the Spyglass Project, other than the soils conditions (the 'Nonsoils Claims')." They then allocated $1.5 million of the developers' settlement payment to the soils claims, along with the value of the assigned claims ($300,000). The remainder (the developers' $3,903,500 contribution and the additional contribution by the subcontractors ($1,096,500)) was allocated to the nonsoils claims. The petitioners do not dispute that this overall $6.5 million settlement figure ($6.8 million when the value of the assignment of rights is included) is an amount within the *Tech-Bilt* ballpark. (*Tech-Bilt, supra*, 38 Cal.3d at pp. 499-500.)

Before analyzing the factual basis in the record for this allocation, we state the standards for evaluation of the good faith of such an allocation as part of the good faith settlement determination. In *Alcal, supra,* 8 Cal.App.4th, the court made these observations defining the problem:

"In the typical one-plaintiff, multiple-defendants, personal injury action each tortfeasor is potentially liable for the same injury to the plaintiff. Therefore the full settlement by one defendant will offset a judgment against other tortfeasors; no allocation of the settlement is required. But many lawsuits and many settlements do not fit this pattern. In some, the amount of the offset is uncertain because one settlement covers multiple plaintiffs or causes of action with different damages [citations], or because a sliding scale settlement is used and payments by the settling defendant are contingent upon the degree of plaintiff's success against the remaining defendants [citation]. In others, the amount of the offset is clouded by injection of noncash consideration into the settlement [citations] or, as here, by settling claims for separate injuries not all of which would be attributable to conduct of the remaining defendants.

"In a situation where the cash amount of the settlement does not dictate the amount of the offset, the settling parties must include an allocation or a valuation in their agreement. A natural tension will exist between plaintiff, who benefits by undervaluing the settlement in order to permit greater recovery against the remaining defendants, and the settling defendant, who would want the settlement value high enough to be approved in order to relieve settling defendant from liability for comparative indemnity or contribution. '[R]equiring a joint valuation by the plaintiff and the settling defendant should generally produce a reasonable valuation.' [Citation.]" (*Alcal, supra,* 8 Cal.App.4th at pp. 1124-1125.)

 Evaluation of the parties' allocation of settlement proceeds is committed to the sound discretion of the trial court in the good faith settlement approval process. The court may rely on its own expertise and the opinions of experts in reaching a determination of the good or bad faith of a settlement. (*Tech-Bilt, supra,* 38 Cal.3d at pp. 499-500.) However, the court may not be able to do more than simply make a best estimate, and any challenge to the agreement's assigned value should not be interpreted as giving the challenging defendant a right to a minitrial on the valuation issue. "The nature, extent and the procedure regarding any such challenge is left to the discretion of the trial court." (*Abbott Ford, supra,* 43 Cal.3d at pp. 879-880, fn. 23.)

In *Toyota Motor Sales U.S.A., Inc.* v. *Superior Court* (1990) 220 Cal.App.3d 864, 878, footnote 9 [269 Cal.Rptr. 647], the court observed that

". . . any factual findings or determinations made on contested issues of liability or damages are tentative and solely for the purposes of evaluating the good faith of a proposed settlement *as of the date of such a valuation.*" (Original italics.) On appellate review, a trial court's determination of good faith of a settlement involving the resolution of factual issues will be upheld if supported by substantial evidence. (*Id.* at pp. 870-871.)

In *Arbuthnot v. Relocation Realty Service Corp.* (1991) 227 Cal.App.3d 682, 689-690 [278 Cal.Rptr. 135] (hereafter *Arbuthnot*), the Court of Appeal discussed these procedures, applying them to a situation in which a settling defendant allowed entry of a default judgment against him in a certain amount and assigned to the plaintiffs certain claims against a third party, his employer, whose conduct led to the entry of default against him. (*Id.* at pp. 685-688.) Although the settlement agreement set no value for this consideration given in settlement, the court held that the procedures set forth in *Abbott Ford* for evaluating sliding scale agreements would apply in instances where payment is contingent or where value other than cash is given. It was held that the settling parties should have provided the trial court with a value for the settlement agreement. (*Arbuthnot, supra,* at p. 690.)

In its objections to the soils versus nonsoils allocation, Erreca's chiefly argues that the settlement amounts are too vaguely defined for adequate good faith analysis, because the plaintiffs could be obtaining a double recovery for damages that could fall into either the soils or nonsoils category (e.g., stucco cracks). Stone contends the settling parties inadequately explain the rationale of their allocation of settlement proceeds between soils and nonsoils issues. Both petitioners argue this court should require settling parties to support their application for good faith settlement approval with a showing of the framework of the settlement: a matrix demonstrating which settlement funds are attributed to which categories of damages (e.g., stucco, framing, or roofing) and to which settling defendant's account, so that nonsettlors may more accurately determine their remaining exposure in their respective potential areas of liability, once a setoff or credit has been set by the court.

In addition to these arguments, Stone contends it was deprived of due process because it was not represented at settlement negotiations where these figures were reached, and because some court hearing was evidently held on the allocation and credit issues, before Judge Midlam went on to refer those issues to the special master for resolution. We address the substantive objections and procedural issues separately.

## A

### *Factual Basis for the Allocation of Settlement Funds*

■■■ Where, as here, an allocation of settlement moneys among disputed issues has been made, the situation is analogous to cases in which the settlement payments are contingent or where noncash consideration is paid for settlement. (*Arbuthnot, supra,* 227 Cal.App.3d at p. 690.) In each instance, the settling parties have the most knowledge of the value of the various claims they are attempting to settle and can best allocate settlement proceeds among those various claims, subject to court approval. They are thus required to meet the standards of *Abbott Ford* by carrying the burden of determining the value of the settlement agreement, including its component parts. ■■■ In evaluating the accuracy of the settling parties' valuation, the court "may not be able to do more than simply make its best estimate, . . ." (*Abbott Ford, supra,* 43 Cal.3d at p. 879, fn. 23.) Clearly, the nonsettling defendant is not entitled to a mini-trial on the valuation issue. (*Ibid.*)

■■■ Where the settling parties have agreed to allocate less than all of the settlement amount to a portion of the causes of action, an evidentiary showing is required to justify such allocation. (*Knox* v. *County of Los Angeles* (1980) 109 Cal.App.3d 825, 836-837 [167 Cal.Rptr. 463].) The effectiveness of such an allocation depends upon its good faith. "The statutory requirement of good faith extends not only to the amount of the overall settlement but as well to any allocation which operates to exclude any portion of the settlement from the setoff. [Citations.]" (*Id.* at p. 837.)

■■■ Here, by allocating $1.5 million out of the total settlement to the soils issues, the parties effectively reduced the amount of the setoff available to the soils defendants, Erreca's, Stone, and So. Cal. Soils. To evaluate the good faith of this allocation, the trial court was required to evaluate the showing made in support of the good faith settlement determination. That showing included plaintiffs' attorney's declaration giving plaintiffs' total cost of repairs estimate at $14,668,789 total, with a cost of repair estimate for soils set at $8,702,650. However, plaintiffs' most recent settlement demand set a soils figure of $2 million. By contrast, the developers' geotechnical engineer's declaration estimated soils repairs costs at only $175,000 to $200,000. Developers also submitted a declaration by their construction consultant, Murphy, estimating overall preliminary repair costs at $1,092,875 to $1,243,647, excluding hardscape and foundation repairs.

In the special master's amended recommendations, he suggested the allocation of $1.5 million to soils, based upon his estimation that the

plaintiffs would be at least 90 percent successful on the nonsoils issues, such that he estimated that $5 million of the total settlement should be allocated to nonsoils issues. The additional contributors' amount of $1,096,500 was all attributed to the nonsoils issues. The leftover ($1.5 million) would go to soils. In Erreca's and Stone's opposition to the good faith settlement motion, they pointed out that a number of the additional contributors had expressed their disagreement with the settlement's allocation of their contributions exclusively to nonsoils issues. However, in examining their individual good faith settlement motions, attached as exhibits to the opposition to the petition for writ of mandate, we note that those additional contributors as moving parties apparently did not object to the court concerning that allocation.[5] Such temporary dissension in the ranks, alone, is not enough to torpedo this settlement.

## B

### Due Process Issues

Stone's due process arguments on the allocation issue consist of three particular claims: (1) It was not present at settlement negotiations, including those before the special master having some "imprimatur of official action," to present its position about the allocations made; (2) due to the occurrence of the June 3, 1993, ex parte hearing at which a specific referral to the special master was made, after some discussion, of the allocation and credit issues, Judge Midlam should be disqualified from conducting any proceedings on the good faith settlement approval motion; and (3) the hearing on the good faith settlement motion was too cursory, since oral argument was essentially not allowed and time was shortened for response.

Taking these objections in order, we first note that Erreca's and Stone as nonsettling parties had no right of which we are aware to be present at settlement negotiations involving other parties, in which they did not choose to participate. However, they justifiably raise concerns about the fairness of negotiation and tentative resolution of issues affecting them which occurred in their absence, particularly concerning allocation of settlement proceeds in such a manner as will affect the ultimate setoff or credit they will receive against any future judgment. The twin safeguards against unfair results in

---

[5]A few of the additional contributors (three) apparently did not file their own motions, and it is unknown what the current status of their objections, if any, to the nonsoils allocation might be. However, since we have been able to examine the motions filed by six of the nine alleged objectors to the allocation, and found they did not pursue any objection with the court, we do not consider this issue of the additional contributors' allocations to be dispositive, particularly since we have not been provided with any information about the other three objectors' positions on the subject at the time of the hearing.

this respect lie in the adverse nature of the settlement negotiations and in the requirement of court approval of the settlement elements before they may be given full effect. In *Peter Culley & Associates* v. *Superior Court* (1992) 10 Cal.App.4th 1484, 1497-1498 [13 Cal.Rptr.2d 624], the court observed that there would be no justification for giving presumptive effect to an allocation which is not the product of adverse negotiation. Even though one may presume that the parties have reasonably allocated settlement proceeds between issues in the action, such a presumption "should be reserved for a settlement by parties with truly adverse interests in the allocation. [Citation.]" (*Id.* at p. 1498; see *Slottow* v. *American Cas. Co.* (9th Cir. 1993) 1 F.3d 912, 915-916.) We discuss this rule further in part I-C, *post*.

■ On the second claim, a judge who hears a settlement proceeding is not barred from hearing a good faith settlement motion. (*Horton* v. *Superior Court* (1987) 194 Cal.App.3d 727, 733-734 [238 Cal.Rptr. 467].) Special problems, however, arise from the use (as here) of the independent calendar methodology of court management to facilitate partial settlement of complex cases. The independent calendar system anticipates that its judges will involve themselves in settlement discussions; indeed, that is one of the reasons for creating an independent calendar or all-purpose assignment system. The difficulty here is that these settlement discussions went beyond general matters to a more specialized stage in which the judge was presiding over negotiations among some of the parties, including tentative resolutions of allocation of damages, valuation of indemnity rights, and credits for nonsettling defendants. Those are the same issues that the court was obliged to pass on in the contested good faith settlement approval proceedings (§ 877.6) and that is why we believe the court in this instance was prudent in sending these matters out to a special master. We agree, however, with Stone that the trial court should not have initially presided over the four-hour preliminary ex parte hearing before delegating the allocations and related issues to the special master. Those proceedings may have given the impression that the court was willing to commit itself, at that ex parte settlement hearing, to a particular position on allocations, valuations, and credits, the same issues that the court was going to have to decide later at the contested hearing. Use of such a procedure creates an appearance of unfairness that should be avoided.

With reference to the role of a special master in complex matters such as this, we recognize the special master is an officer of the court who is assumed to be acting independently; the special master is not a clone of the court or a substitute for it. The master makes his or her report on settlement matters to the court, which is then free to exercise its independent judgment by accepting or rejecting it. At the hearing on the proposed approval of a

settlement, the court has the benefit of the briefing from both sides, and makes its decision on the good faith of a particular settlement that was reached by the parties either on their own or with the assistance of the special master. While generally in a settlement like this, where the rights of nonsettling parties are implicated, the court itself should not supervise the settling parties' determination of those amounts such as allocations, valuations, and credits (because that is precisely what the court will have to pass on in the approval proceedings), this record discloses no prejudicial abuse of discretion in either the trial court's conduct of the hearing on the motion or by its referral, after some preliminary discussion, of the allocation and credit issues to the special master.

■ Turning to Stone's third claim regarding the extent of the hearing itself, we first note that, in light of the evident legislative purpose to expedite where possible the hearing of good faith settlement motions (§ 877.6, subd. (b)), the trial court was not bound to hear oral argument in the absence of new contentions after having "digested" all the paperwork. Where any large settlement is involved, however, affecting the rights of numerous parties, it would be the better practice for the trial court to afford a thorough hearing on the request for settlement approval, even though such hearing represents only the last gasps of a portion of the action as it affects both settling and nonsettling parties. We acknowledge that nonsettling parties who object to another's settlement have a difficult task in carrying the burden of proof to show that the proposed settlement is not in good faith (§ 877.6, subd. (d)); the court should not make that task more difficult than absolutely necessary. Similarly, although the order shortening time for filing of opposition to six days was under the circumstances not an abuse of discretion (see *Barajas* v. *USA Petroleum Corp.* (1986) 184 Cal.App.3d 974, 988 [229 Cal.Rptr. 513]), under other circumstances, such a short time allowed for response might well be inappropriate.

Of course, a hearing on a request for good faith settlement approval presupposes the opportunity for a complete evaluation by the trial court, and approval should not be deemed a fait accompli where any material doubts are raised about the necessary good faith showing. We are satisfied here, however, that due to the trial court's familiarity with the issues, the necessary evaluative process went on and the parties were not prejudiced by the speedy nature of the hearing.

C

*Analysis*

■ Under all the circumstances, we believe that the necessary adversity between parties was present here among the settling parties so as to justify

giving the allocation made full effect in the settlement proceedings as against the nonsettling defendants. (*Peter Culley & Associates* v. *Superior Court*, *supra*, 10 Cal.App.4th at pp. 1497-1498.) There was evidence of a wide range of soils damages estimates and plaintiffs' settlement demands, showing that the parties had an actual dispute to negotiate, thus giving rise to a presumption that their allocation was reached at arm's length and was reasonable. Both Stone's and Erreca's insurers raised coverage defenses based on the policies and the indemnity provisions of the Stone/developer contract for the sale of land, including a work-performed exclusion. Erreca's and Stone also raised the possibility that the developer had been negligent in installing foundations that were too thin and in moving soil around in the course of development, affecting the nonexpansive soil layer. Moreover, the fact that a special master was needed to assist in settlement negotiations gives some indication that the parties had adverse interests throughout the settlement proceedings, since they were unable to reach settlement without assistance.

Thus, the trial court had before it a good deal of evidence on the proportionate liability of the parties, and made factual evaluations of that evidence. The trial court could properly utilize its own experience, the attorneys' evaluations, and expert opinion in making a decision upon the valuation issue. (*Tech-Bilt*, *supra*, 38 Cal.3d at pp. 499-500.) This settlement does not suffer from the vice of the settlement in *Alcal*, *supra*, 8 Cal.App.4th at page 1127, where the Court of Appeal was unable to determine who settled with whom and which parties made what allocations. As the court in *Alcal* explained, a party seeking confirmation of a settlement must explain to the court and to all other parties not only who has settled with whom and for what dollar amount, but whether any settlement is allocated and how between issues and/or parties, as well as describing and valuing any nonmonetary consideration included. (*Id.* at p. 1129.) However, nowhere in *Alcal* is a requirement imposed that the parties explain the rationale behind the allocation, and we are reluctant to impose one where there is adequate evidentiary support for the allocation in any case. While setting forth a more precise explanation of the allocation of settlement proceeds among damages categories and settling defendants might well be a workable settlement procedure in some cases, and should in fact be generally encouraged, in other cases it would serve to discourage settlements, particularly partial settlements of complex cases where some defendants are not in a settlement posture for various reasons.

To the rules set forth in *Alcal*, therefore, we add the following principles: A party seeking confirmation of a settlement must explain to the court and to all other parties, by declaration or other written form, the

evidentiary basis for any allocations and valuations made, and must demonstrate that the allocation was reached in a sufficiently adversarial manner to justify the presumption that a reasonable valuation was reached. (*Abbott Ford, supra*, 43 Cal.3d at pp. 879.) However, the court hearing the motion is not required to conduct an evidentiary hearing on the basis for the allocation, as the Supreme Court has made clear that no minitrials are to be conducted on valuation issues in the good faith settlement context. (*Id.* at pp. 879-880, fn. 23.) Instead, the trial court is accorded wide discretion to control "[t]he nature, extent and the procedure" regarding any challenges to the valuation placed on the settlement by the settling parties. (*Ibid.*)

■ With the due process caveats expressed above (see part I-B, *ante*), we conclude there is substantial evidence in this record to support the court's evaluation that the soils/nonsoils allocation was a reasonable one and satisfied good faith settlement standards. (*Knox v. County of Los Angeles, supra*, 109 Cal.App.3d at p. 837.) Thus, regarding the soils/nonsoils allocation issues, the petitions are not persuasive.

## II

### Assignment of Indemnity Rights

In addition to the $1.5 million cash consideration for the settlement, the settling parties set a value of $300,000 upon the developers' assignment to the plaintiffs of its indemnity and contribution rights as against the nonsettling defendants. We shall discuss in part III, *post*, what credit should be afforded the nonsettling defendants for this assignment of rights as against any plaintiffs' judgment, and shall also evaluate the problem of double recovery that such assignment of indemnity rights to the plaintiffs arguably represents. ■ In this section, however, we will address only the petitioners' contentions that this assignment of rights was inadequately valued, as compared to the potential recovery of a $1.5 million payment that it represents.

It is clear that assignment of indemnity rights may constitute a valuable noncash consideration for settlement. In *Southern Cal. Gas Co. v. Superior Court* (1986) 187 Cal.App.3d 1030, 1034-1037 [232 Cal.Rptr. 320], the court granted a writ of mandate to require the trial court to vacate a good faith settlement approval because the parties had not placed a value upon certain defendants' assignment to plaintiffs of their rights under the defendants' insurance policy, under which the insurer had denied coverage and refused to defend. The Court of Appeal noted that the assignment of tort and contract rights with respect to the insurance policy was a part of the

consideration paid by the settling defendants, that such rights were valuable, and that under section 877, subdivision (a) the nonsettling defendants were entitled to credit against any eventual judgment for the value of the assigned rights. The court explained that the value of the assigned rights could have been determined by declaration or by expert testimony, and the value then allocated between the several plaintiffs by agreement among the settling parties. Alternatively, the trial court could have provided for credit in favor of the nonsettling defendants for any amounts recovered by the plaintiffs through the assigned rights, as long as the assigned rights were pursued with due diligence. (*Southern Cal. Gas Co.*, *supra*, 187 Cal.App.3d at p. 1036.)[6]

In *Alcal*, *supra*, 8 Cal.App.4th 1121, the court noted that the settlement included an assignment of the developers' indemnity rights against the roofer to the plaintiff homeowners' association, but that the settling parties had failed to place a value upon that assignment of rights. The court stated: "Without more information about the assignment, we cannot determine whether valuable consideration was transferred here or whether the assigned rights merely duplicated Association's existing rights against roofer. If the assigned rights were valuable, the settlement agreement should have set their value and the court should have considered the added value when determining whether the settlement was in good faith. [Citation.] The added value would then be included in any offset to any judgment against roofer." (*Alcal*, *supra*, 8 Cal.App.4th at p. 1128.)

Here, in the developers' moving papers, they submitted a declaration by their attorney stating that the plaintiffs and developers agreed that the assigned claims were valued at $300,000, and explaining the basis for the valuation as a discount from the maximum $1.5 million entitlement to indemnity (this discount representing the cost to prosecute the claims, the probability of prevailing on them, and the likelihood of collecting on a judgment on them). The developers' attorney opined that it was likely they could prevail against Stone on a strict liability theory in the comparative equitable indemnity claim, but that because negligence would have to be proven as to Erreca's and So. Cal. Soils, prevailing on those claims would be more difficult. The likelihood of collecting on a judgment on the assigned claims against any of the soils defendants was evaluated as negligible since the entities were all insolvent and had limited insurance, and the insurers were asserting coverage defenses.

---

[6]Other such intangible assets have been considered proper consideration for settlement. (See *Arbuthnot*, *supra*, 227 Cal.App.3d 682 [entry of default judgment and assignment of rights against an employer, with the assignor's cooperation in pursuing the rights]; *Armstrong World Industries, Inc.* v. *Superior Court* (1989) 215 Cal.App.3d 951 [264 Cal.Rptr. 39] [waiver of litigation costs].)

In Erreca's opposition to the motion, it argued that the $1.2 million discount figure was too great, and only a small amount (15 percent) should be discounted for risk and cost factors. Another attorney for Erreca's opined in his declaration that the value of the assigned claims should be $2 million, representing plaintiffs' most recent settlement demand soils figure. He also stated there was an express indemnity contract between Erreca's and Stone which would operate to benefit the plaintiffs. The special master followed the basic reasoning set out by the developers in their moving papers, recommending that the value of the assignment of rights be set at $300,000, and the court accepted that figure in ruling on the motion.

To evaluate the trial court's ruling granting good faith settlement approval, we apply the same rules set forth in part I, *ante*. Thus, we look to whether the trial court's factual determinations, i.e., accepting the $300,000 figure, are supported by substantial evidence. (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court, supra*, 220 Cal.App.3d at p. 871.) " '[R]equiring a joint valuation by the plaintiff and the settling defendant should generally produce a reasonable valuation.' [Citation.]" (*Alcal, supra*, 8 Cal.App.4th at p. 1125.) No minitrial on the valuation issue should be required. (*Abbott Ford, supra*, 43 Cal.3d at pp. 879-880, fn. 23.) The trial court can utilize its own experience, the attorneys' evaluations, and expert opinion in making a decision upon the valuation issue. (*Tech-Bilt, supra*, 38 Cal.3d at pp. 499-500.)

Once the settling parties made a showing that the $300,000 figure was within their reasonable range of liability (*Arbuthnot, supra*, 227 Cal.App.3d at p. 690), it was incumbent upon the nonsettling defendants to carry the burden of proof as to lack of good faith on that issue. (§ 877.6, subd. (d).) In an effort to do so, nonsettlors made the inconsistent arguments that (1) the allocation to the soils claims assignment of rights was too low, as the indemnity rights were quite valuable, and (2) they had good defenses to any indemnity obligation based on contractual theories and also because the developers allegedly performed substandard foundation and soils work.

Moreover, at oral argument, attorneys for both Stone and plaintiffs expressed the opinion that valuation of the assignment of rights should be delayed until after any trial takes place to establish conclusively, at a dollar figure, any entitlement to recovery on the indemnity claims. In *Southern Cal. Gas Co.* v. *Superior Court, supra*, 187 Cal.App.3d at page 1036 it was held that since such an assignment of rights can be a valuable asset given in settlement of claims, it should be valued at the time of settlement so that a price can be set as part of the good faith approval process. If the time of setting a credit for an assignment of rights were delayed until after a trial

took place, the credit to the nonsettlors would then be fixed at the amount the plaintiffs as assignees recovered at trial. Such a delayed valuation would serve to render the indemnity rights valueless, since they would be wiped out by a full award of credit (see pt. III, *post*). This would remove any incentive for the plaintiffs to accept or the settling defendants to offer such an assignment as settlement consideration. Thus, we agree with the court in *Southern Cal. Gas Co.* that valuation of an assignment of rights should normally take place at the settlement stage so that the good faith of the overall settlement may be fully evaluated.

We recognize that none of the figures reached in settlement will necessarily be the same as those that might result from trial, judgment, and collection attempts. Settlement figures at best are estimates, discounted for various reasons. With the benefit of hindsight it may be possible to say that the value placed upon particular settlement consideration was too high or too low, thus undoing the benefit of the settlement bargain for someone. However, that is one of the unavoidable risks to all parties of litigation in general and pretrial settlements in particular.

Specifically with respect to this valuation of the assignment of rights at $300,000, where the potential recovery could amount to $1.5 million, the developers made a showing of a factual basis for the valuation, based upon estimated cost to prosecute the claims, probability of prevailing on them, and collection prospects for any judgment. While a 20 percent figure for the valuation of the assignment is not large, neither is it just "peanuts" (to carry the *Tech-Bilt* ballpark metaphor, 38 Cal.3d at pp. 499-500, a little further). No firm guidelines as to the proportional value of an assignment of rights can be established, as each case must be evaluated on its unique facts. For all of the above reasons, we find no defect in the trial court's approval of the $300,000 figure as the value of the assigned rights.

### III

*Credit From Settlement Moneys to Be*
*Accorded the Nonsettling Defendants*

Section 877, subdivision (a) provides: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect:

"(a) It shall not discharge any other such party from liability unless its terms so provide, *but it shall reduce the claims against the others in the*

*amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater."* (Italics added.)

 The next issue before us is the amount of reduction of any plaintiffs' judgment to which the nonsettling defendants should be entitled, where the settlement calls for an allocation to soils issues (the same issues for which these nonsettling defendants have potential liability) in the amount of $1.5 million cash consideration and $300,000 in assignment of indemnity rights. Although the moving papers in the good faith settlement approval proceedings indicated that the soils defendants would be entitled to a credit of "the amounts allocated to the soils claims" (presumably all such amounts), the special master reduced that figure to $500,000. His amended recommendation gave as justification for the reduction that he believed the settlement payment by developers represented an amount greater than their likely ultimate actual liability, as compared to Stone's and Erreca's. The trial court adopted this recommendation. The nonsettling defendants argue that this amount is disproportionate to the developers' reasonable range of liability, does not promote equitable sharing of costs among joint tortfeasors, and this aspect of the settlement thus is not in good faith.[7]

 In considering the credit issue, we must take into account not only the policy issues of the good faith settlement approval process (i.e., equitable apportionment of liability and promotion of settlements; *Abbott Ford, supra,* 43 Cal.3d at pp. 871-873, fn. 15), but also another policy interest, "the maximization of recovery to the plaintiff for the amount of . . . injury to the extent that negligence or fault of others has contributed to it." (*Franck* v. *Polaris E-Z Go Div. of Textron, Inc.* (1984) 157 Cal.App.3d 1107, 1116-1117 [204 Cal.Rptr. 321].) Thus, while the nonsettling defendant is entitled to a fair setoff, the injured plaintiff also has a right that the setoff not be excessive. In *Abbott Ford,* the Supreme Court declined to attach a hierarchy or priority to the various public policy objectives in this area, and instead stated that the competing public policies should be harmonized, "taking into account the specific context in which the potential conflict between the various policies appears." (*Abbott Ford, supra,* 43 Cal.3d at p. 872, fn. 15.)

 Since we have found that the allocations to soils issues by the parties ($1.5 million payment and $300,000 valuation of indemnity rights)

---

[7]Contrary to the developers' arguments, the good faith of the settlement as to the credit amount falls squarely within the scope of a petition challenging the approval of such a settlement within the meaning of section 877.6, subdivision (e). Determination of the credit issue to the extent possible cannot be deferred until after any eventual jury verdict, because the entire settlement must be determined to be in good faith as to both settling and nonsettling defendants. (See pt. II, *ante*; *Arbuthnot, supra,* 227 Cal.App.3d at pp. 690-691.)

were within the range of good faith, we reject Erreca's initial argument that the credit to be received should represent the entire $6.5 million settlement (not counting the $300,000 for assignment of indemnity rights). Erreca's and Stone more seriously argue that they are entitled to the entire $1.5 million soils allocation as a credit, and possibly the additional $300,000 for assignment of indemnity rights as well. The argument is that the total amount "paid" by the developers should be credited toward any future judgment against the nonsettlors. (§ 877, subd. (a).) In response, the developers argue that the $1.8 million soils allocation is within the *Tech-Bilt* ballpark (*Tech-Bilt, supra*, 38 Cal.3d at pp. 499-500), as a rough approximation of the developers' proportionate liability. They argue that the credit given should further reflect such an approximation.

It should again be emphasized that in the settlement approval process, the trial court necessarily makes estimations and approximations of the respective liabilities, based upon allegations and evidentiary showings which fall short of trial. (*Abbott Ford, supra*, 43 Cal.3d at pp. 879-880, fn. 23; *GEM Developers* v. *Hallcraft Homes of San Diego, Inc.* (1989) 213 Cal.App.3d 419, 431 [261 Cal.Rptr. 626].) As quoted above, section 877, subdivision (a) provides that the settlement shall reduce the claims against the nonsettling defendants "in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it *whichever is the greater.*" (Italics added.) The applicable amount here is the amount of consideration paid for settlement, which clearly includes the $1.5 million payment (although the petitioners are more vague on the $300,000 valuation of the intangible indemnity rights). Upon this amount, the special master attempted to impose a comparative fault evaluation to reduce the allocation to soils insofar as the credit was concerned, based upon his opinion of the ultimate comparative liability as to soils. The trial court accepted this recommendation in its order.

We believe this ruling on the credit issue was contrary to language in *American Motorcycle Assn.* v. *Superior Court, supra*, 20 Cal.3d at page 604, where the Supreme Court discussed the public policy of section 877 in favor of settlement in the context of comparative equitable indemnity. The Supreme Court stated, "Moreover, to preserve the incentive to settle which section 877 provides to injured plaintiffs, we conclude that a plaintiff's recovery from nonsettling tortfeasors should be diminished only by the amount that the plaintiff has actually recovered in a good faith settlement, *rather than by an amount measured by the settling tortfeasor's proportionate responsibility for the injury.* [Citation.]" (20 Cal.3d at p. 604, italics added.)

In *Knox* v. *County of Los Angeles, supra*, 109 Cal.App.3d at page 833, the court interpreted this language and section 877 as requiring an evidentiary

basis to be shown for the credit to be accorded a nonsettling defendant by reason of a settlement reached by the other defendants, where it was argued that the various defendants were all "claimed to be liable" for the same tort. In making a determination of such a credit due from another's settlement, the trial court is not required or allowed to make a comparative fault finding that the settling defendants were faultless in the matter, which would prevent any credit from being awarded to the remaining defendants. (*Knox, supra,* 109 Cal.App.3d at pp. 833-834.) In drawing its conclusions, the court relied in part on *Jaramillo* v. *State of California* (1978) 81 Cal.App.3d 968, 970 [146 Cal.Rptr. 823], where the court rejected the plaintiff's contention that the nonsettling defendant was only entitled to have the judgment against it " 'reduced by the proportion of liability attributable to settled co-tortfeasors rather than by the amount of consideration given for the settlement.' " This authority clearly indicates that the amount the plaintiff recovers in a good faith settlement should be used to calculate the credit, rather than "an amount measured by the settling tortfeasor's proportionate responsibility for the injury." (*American Motorcycle Assn.* v. *Superior Court, supra,* 20 Cal.3d at p. 604.) Thus, we conclude initially that the $1.5 million soils allocation must be included as a whole in the amount of credit to be accorded nonsettling defendants against any future judgment.

Moreover, the $300,000 valuation placed by the parties upon the assignment of rights must also be included in the credit to be accorded the nonsettling defendants. The parties' valuation of this intangible asset should be considered to be like any other form of consideration paid for the settlement, and thus appears to be a proper item of credit to be accorded the nonsettling defendant. The court in *Alcal, supra,* 8 Cal.App.4th at page 1128 took this approach when it noted that a value should have been placed on certain assigned indemnity rights and the court should have considered the added value when determining whether the settlement was in good faith. The court stated, "The added value would then be included in any offset to any judgment against roofer." (*Ibid.*) In *Abbott Ford, supra,* 43 Cal.3d 858, the sliding scale form of· settlement was approved despite its contingent nature and the difficulties in valuing that type of interest. Based on this authority, and on our discussion of the validity of the parties' valuation of the assignment of rights, there is no room for doubt that the assignment of rights represents a valuable asset given in consideration of settlement, for which the nonsettling defendants are accordingly entitled to credit against a potential judgment. The aggregate credit thus amounts to $1.8 million as a matter of law.[8]

To analyze the potential application of this credit to the extent necessary at the good faith settlement approval stage, and to understand the double

---

[8]Because of our conclusions on this issue, it is unnecessary for us to discuss Stone's particular due process arguments with reference to the credit issue.

recovery issue, two inquiries are necessary. First, what is the nature of the settlement consideration which makes up the credit? Second, what might the plaintiffs' potential judgment include? Here, the plaintiffs have directly sued the soils defendants on negligence and related theories for the soils defects, and the plaintiffs have also been assigned the developers' indemnity rights, including strict liability claims, against the soils defendants.

On the first issue, the application of credit for the $1.5 million cash consideration presents no particular problems; it will be applied as credit to any future judgment the plaintiffs obtain as direct recovery on their own causes of action against the soils defendants for soils defects. The settlement consideration of $300,000 for the assignment of indemnity rights is a little more problematic as far as credit is concerned. Unlike in *Southern Cal. Gas Co. v. Superior Court, supra*, 187 Cal.App.3d at page 1036, no third party insurer was the subject of these assigned indemnity rights. Instead, once these plaintiffs receive the settlement payment for soils from developers, they may also take by assignment the developers' right to indemnity to cover the costs of that payment and thus seek to recover a like amount from the soils defendants. In *Alcal, supra*, 8 Cal.App.4th 1121 the court expressed the concern that it is difficult to determine whether such an assignment represents the transfer of valuable consideration, or whether the assigned rights merely duplicate the plaintiffs' existing rights against the nonsettling defendants.

We believe that no such confusion need arise if the assignment of rights is properly viewed as the transfer of a valuable asset in consideration of settlement, which should be treated like any other valuable asset (e.g., cash, securities, real property, or assignment of a different type of indemnity rights, such as a bad faith cause of action against an insurance carrier) for purposes of setting a credit. Such assignment of indemnity rights merely represents the assignment of a particular variety of chose in action, which may be transferred and recovered upon without violation of any public policy of which we are aware. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 933, pp. 833-834.) In the parties' allocation of settlement consideration, the assignment of rights was placed in the soils category. The credit for the $300,000 value of those rights thus goes toward any future judgment the plaintiffs may obtain on their direct soils claims. If the plaintiffs are able to successfully pursue their assignment of rights through litigation and judgment, they will have reaped a return on the valuable asset they "bought" at settlement, and may be able to make a profit on their efforts. However, such profit or proceeds from their asset should not be characterized as a "double recovery," because the nonsettlors have been accorded a credit in the direct action for the fair valuation of the assignment

of rights, and later developments (such as any indemnity recovery) do not affect the good faith of the settlement at the time it was approved. Thus, if the two types of primary rights of the plaintiffs are distinguished from one another (direct recovery v. indemnity rights), the problem of a potential double recovery due to the assignment of rights is seen to be illusory.[9]

Moreover, with regard to the allocation issue, the danger of a double recovery also diminishes where (1) there is an adequate evidentiary basis shown for an allocation to a particular area of damages in which the nonsettling defendants are claimed to be liable, (2) the allocation was reached in an appropriately adverse negotiation, giving rise to a presumption of reasonableness, and (3) any good faith approval order gives to the nonsettlors an accurate award of credit against any eventual judgment that might be awarded against them in favor of plaintiffs. This procedure adequately resolves concerns about potential double recovery for purposes of ascertaining if the settlement reached was in good faith. The trial court is required to exercise its best judgment in its sound discretion in evaluating the agreement of the parties, including its effect upon the nonsettling defendants; good faith is required of the settling parties toward each other and also toward the nonsettling defendants. (*Southern Cal. Gas Co.* v. *Superior Court*, *supra*, 187 Cal.App.3d at p. 1036.)

In conclusion, we are aware that new forms of settlement and new settlement strategies are continually being evolved. Under section 877 et seq., the task has been left to the trial court to ensure that those settlements are kept within the bounds of fairness to both the settling parties and the nonsettling parties. ■■ The Supreme Court has indicated repeatedly that the discretion of the trial court must be accorded a wide scope and the exercise of such discretion must be accorded due deference in order for the system to work as fairly as possible. The major goals of equitable sharing of

[9]To give an illustration, suppose that in this case the plaintiffs go to trial against the remaining soils defendants and obtain a $3 million judgment on their direct action, as well as $1.5 million for assigned indemnity rights. To this $3 million direct recovery will be applied a credit of $1.8 million; plaintiffs will take home from the soils defendants $1.2 million plus $1.5 million as assignees, an amount still below the jury's assessment of $3 million soils damages. When we add to that $2.7 million recovery the $1.5 cash settlement from the developers, plaintiffs get $4.2 million, over the jury's verdict, but the excess recovery should be viewed as plaintiff's profit or return on their investment in pursuing the assigned cause of action. Soils defendants cannot complain because they only paid an amount below the jury's verdict, and were properly subject to both direct claims and indemnity claims. Since the developer sold its indemnity rights to end its involvement in the litigation, it also cannot complain that the plaintiffs made a profit through their own efforts. Of course, many other possible scenarios could be drawn up, but the main principle is that a proper valuation of the assignment of rights and a credit in that amount (in addition to any other credits due) will adequately protect the nonsettlors from a bad faith settlement in this regard.

costs among the parties at fault and the encouragement of settlements must be harmonized by taking into account specific contexts in which potential conflict between these policies appears. (*Abbott Ford*, *supra*, 43 Cal.3d at pp. 872-873, fn. 15, 879-880, fn. 23.) Such exercise of discretion, however, must take into account certain fixed principles that have been established concerning a nonsettling party's right to credit for the portion of settlement monies paid that are attributable to particular areas of the party's comparative fault, even though good faith settlement evaluations necessarily represent a tentative or preliminary assessment of such fault. (*Toyota Motor Sales U.S.A, Inc.* v. *Superior Court*, *supra*, 220 Cal.App.3d at p. 878, fn. 9.) Good faith settlements do not call for a perfect or nearly perfect apportionment of liability. (*Abbott Ford*, *supra*, at p. 874.) "What is required is simply that the settlement not be grossly disproportionate to the settler's fair share." (*Id.* at pp. 874-875.) Once the credit issue is resolved in the manner we have indicated, this settlement meets that standard.

## DISPOSITION

The petitions are granted with directions to the trial court to vacate its order approving the good faith settlement unless the order is modified to allow a $1.8 million credit to the nonsettling defendants.

Todd, Acting P. J., and Froehlich, J., concurred.

Petitioner's applications for review by the Supreme Court were denied Feburary 24, 1994.