[No. D008119. Fourth Dist., Div. One. Aug. 22, 1989.]

GEM DEVELOPERS et al., Cross-complainants and Appellants, v.
HALLCRAFT HOMES OF SAN DIEGO, INC., Cross-defendant and
Respondent;
BONITA GRANDE CONDOMINIUM OWNERS ASSOCIATION,
Intervener and Appellant.

420

**COUNSEL**

Thomas A. Davies for Cross-complainants and Appellants.

John A. Bergen for Cross-defendant and Respondent.

Aguirre & Eckmann, Gary J. Aguirre, James K. Eckmann and Arthur H. Skola for Intervener and Appellant.

**OPINION**

**KREMER, P. J.**—GEM Developers (GEM) and Bonita Grande Condominium Owners Association (Association) appeal a judgment on the pleadings in favor of Hallcraft Homes of San Diego, Inc. (Hallcraft) on a claim for comparative equitable indemnity on a strict liability theory. We conclude equitable indemnity may be sought on a strict liability theory in this case and therefore reverse.

FACTS

Since the trial court rendered judgments for Hallcraft on the pleadings, we must accept the allegations of the parties opposing judgment as true and determine whether their allegations state, or can be amended to state, a cause of action. (See *Sullivan* v. *County of Los Angeles* (1974) 12 Cal.3d 710, 714-715, fn. 3 [117 Cal.Rptr. 241, 527 P.2d 865].)

In 1971, Hallcraft owned a tract of land in San Diego County. Hallcraft, intending to develop the property, had the land mass-graded and filled in the early 1970's. Hallcraft also hired architects and engineers to draw up

plans to construct condominiums on the land. Hallcraft completed the work sometime between 1971 and 1973.

In 1976, Hallcraft sold the graded land and architectural drawings first to Clearwater Construction Corporation which quickly transferred the land and drawings to Bicentennial Builders which, in turn, transferred to GEM. Bonita alleged Clearwater, Bicentennial and GEM were alter egos and or agents of each other. GEM continued the development of the condominiums begun by Hallcraft. GEM's soil engineers tested the upper one foot of soil, GEM's landscaping subcontractors fine-graded the upper one-tenth of a foot of soil and GEM's construction contractors built condominiums on the lots. GEM sold the completed condominium units to members of the public.

In 1982, the Association noticed cracking and tilting of the swimming pool. In September 1982, the Association sued GEM and others (collectively referred to as GEM) on theories of negligence, strict liability and breach of warranty for damages to common areas and structures due to soil subsidence. The Association did not name Hallcraft in their complaint. GEM cross-complained against Hallcraft and others for equitable indemnity.

On September 8, 1986, trial proceeded before a judge on the Association's action on a stipulated set of facts. The judge found in favor of the Association on all theories and awarded damages of $3,216,514.26 plus $1,185.78 in costs. The judge did not resolve the issues in GEM's cross-complaint and specifically ordered the stipulation of facts and judgment would not be binding on Hallcraft at trial.

GEM's insurer paid to the Association about a million dollars in partial satisfaction of the judgment and assigned all subrogation, indemnity and contribution rights against Hallcraft to the Association. Thereafter, the Association, with leave of the court, intervened in the action between GEM and Hallcraft.

Hallcraft moved for judgment on the pleadings as to both GEM and the Association on their claim for equitable indemnity based on strict liability theory. The trial court agreed and granted judgment on the pleadings as to the cause of action based on strict liability. The Association moved to amend but the court denied leave. The Association and GEM thereafter dismissed, without prejudice, their causes of action which were not based on strict liability. The judgments on the pleadings were entered against the Association and GEM respectively on February 23, 1988, and April 1, 1988.

Discussion

I

*Equitable Indemnity on a Strict Liability Theory*

 Hallcraft contends GEM may not seek comparative equitable indemnity on a strict liability theory. Hallcraft relies on a series of cases addressing strict liability claims in commercial settings. (See *Sumitomo Bank* v. *Taurus Developers, Inc.* (1986) 185 Cal.App.3d 211 [229 Cal.Rptr. 719]; *Muro* v. *Superior Court* (1986) 184 Cal.App.3d 1089 [229 Cal.Rptr. 383]; *Sacramento Regional Transit Dist.* v. *Grumman Flxible* (1984) 158 Cal.App.3d 289 [204 Cal.Rptr. 736]; *Kaiser Steel Corp.* v. *Westinghouse Elec. Corp.* (1976) 55 Cal.App.3d 737 [127 Cal.Rptr. 838]; *U.S. Financial* v. *Sullivan* (1974) 37 Cal.App.3d 5 [112 Cal.Rptr. 18].) In these cases, the courts held strict liability was not available in suits between two commercial entities for a business loss.

These cases focus on the rationale behind the adoption of strict products liability theory. Under strict liability theory "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury . . . ." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) The theory was adopted because sales warranty theory, developed to meet the needs of commercial transactions and requiring a showing of privity, was inadequate to protect consumers. (*Kaiser Steel Corp.* v. *Westinghouse Elec. Corp., supra,* 55 Cal.App.3d 737, 746-747.) "The doctrine of manufacturers' and suppliers' strict liability in tort was developed primarily to protect individual consumers, users, and, to some extent, bystanders who are in no position to protect themselves from defective products" rather than to protect commercial entities. (*U.S. Financial* v. *Sullivan, supra,* 37 Cal.App.3d 5, 18.) By imposing strict liability in tort the loss is distributed by the product manufacturer; the manufacturer, unlike the consumer, can insure against the loss and distribute it as a cost of doing business. (*Sumitomo Bank* v. *Taurus Developers, Inc., supra,* 185 Cal.App.3d 211, 227.)

 The cases conclude strict liability theory was not intended to be used in a situation involving a suit between two businesses and a commercial loss since a business is not " 'in such a vulnerable position' " as is a consumer and has the capacity to spread the risks of harm resulting from a defective product (see *Sumitomo Bank* v. *Taurus Developers, Inc., supra,* 185 Cal.App.3d at p. 227; *U.S. Financial* v. *Sullivan, supra,* 37 Cal.App.3d 5, 18-19 [holding a lender may not sue a developer on a strict liability theory

for defects in lots or impairment of the lender's security]; see also *Muro* v. *Superior Court, supra,* 184 Cal.App.3d 1089, 1098 [holding a commercial tenant could not pursue a strict liability claim against a commercial lessor]); businesses which are "merchants" within the meaning of the Uniform Commercial Code have relatively equal bargaining power and can negotiate for "a product designed to negotiable specifications and not furnished off the shelf" (see *Kaiser Steel Corp.* v. *Westinghouse Elec. Corp., supra,* 55 Cal.App.3d 737, 748 [holding a steel mill operator could not rely on a strict liability theory in its suit against the manufacturer of a defective motor which destroyed the motor and caused a temporary shut down of the mill]); statutory principles of sales warranties work well in a commercial setting, with the doctrine of privity creating no artificial barriers to recovery (*ibid.*); and application of a strict liability theory "would improperly invade rules of law adopted by the Legislature in the California Uniform Commercial Code" when the Uniform Commercial Code regulates "the various aspects of plaintiff's purchase of [the product] from defendant, including liability for defects based on express and implied warranties" (*Sacramento Regional Transit Dist.* v. *Grumman Flxible, supra,* 158 Cal.App.3d at pp. 294-295 [holding an operator of a mass transit fleet of busses could not sue a manufacturer for defects in the busses on a strict liability theory]).

In sum, these cases hold that when a lawsuit arises in a commercial setting between two businesses and involves only a business loss, the parties should use normal commercial remedies (e.g., the Uniform Commercial Code) rather than a theory developed for the benefit of consumers (i.e., strict products liability). These cases, however, do not address the application of strict liability in the context of a claim for comparative equitable indemnity.

■ In contrast to the doctrine of strict liability which is designed to benefit the consumer-plaintiff, the doctrine of comparative equitable indemnity is designed to do equity among defendants. Under the equitable indemnity doctrine, defendants are entitled to seek apportionment of loss between the wrongdoers in proportion to their relative culpability so there will be "equitable *sharing* of loss between multiple tortfeasors." (*American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 595, 597-598 [146 Cal.Rptr. 182, 578 P.2d 899], italics in original.) The purpose of equitable indemnification is to avoid the unfairness, under joint and several liability theory, of holding one defendant liable for the plaintiff's entire loss while allowing another responsible defendant to escape "'scot free.'" (*Id.* at pp. 607-608.) It is an extension of the comparative fault doctrine which allowed loss to be apportioned between plaintiff and defendants according

to their respective responsibility for the loss. (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1197[246 Cal.Rptr. 629, 753 P.2d 585].)

■ Originally applied to defendants whose negligence caused the plaintiff's loss (see, e.g., *American Motorcycle Assn.* v. *Superior Court, supra,* 20 Cal.3d 578), the Supreme Court later expanded the doctrine to allow apportionment of loss between a negligent plaintiff and a strictly liable defendant (*Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162]), and between a defendant liable in strict liability and negligence and a defendant strictly liable (*Safeway Stores, Inc.* v. *Nest-Kart* (1978) 21 Cal.3d 322 [146 Cal.Rptr. 550, 579 P.2d 441]).[1]

In the *Safeway* case, the Supreme Court stated: "[n]othing in the rationale of strict product liability conflicts with a rule which apportions liability between a strictly liable defendant and other responsible tortfeasors." (21 Cal.3d at p. 330.) The court explained: "[E]ven in cases in which one or more tortfeasors' liability rests on the principle of strict liability, fairness and other tort policies, such as deterrence of dangerous conduct or encouragement of accident-reducing behavior, frequently call for an apportionment of liability among multiple tortfeasors." (*Ibid.*; see also *Far West Financial Corp.* v. *D & S Co., supra,* 46 Cal.3d 796, 812-813 citing this language with approval.) The Supreme Court concluded: "[A] contrary conclusion, which confined the operation of the comparative indemnity doctrine to cases involving solely negligent defendants, would lead to bizarre, and indeed irrational, consequences. Thus, if we were to hold that the comparative indemnity doctrine could only be invoked by a negligent defendant but not a strictly liable defendant, a manufacturer who was actually negligent in producing a product would frequently be placed in a better position than a manufacturer who was free from negligence but who happened to produce a defective product, for the negligent manufacturer would be permitted to shift the bulk of liability to more negligent cotortfeasors, while the strictly liable defendant would be denied the benefit of such apportionment. [Citation.]" (*Safeway Stores, Inc.* v. *Nest-Kart, supra,* 21 Cal.3d 322, 332.)

■ Hallcraft asserts the *Safeway* case is factually distinguishable because there the plaintiff sued and recovered against both the defendants.

---

[1] In *Davis* v. *Air Technical Industries, Inc.* (1978) 22 Cal.3d 1 [148 Cal.Rptr. 419, 582 P.2d 1010], the Supreme Court was presented with a case where loss was apportioned between two strictly liable defendants. The issue the Supreme Court faced in that case was not the propriety of the apportionment among strictly liable defendants but a claim of indemnity for attorney's fees. Similarly, in *Far West Financial Corp.* v. *D & S Co.* (1988) 46 Cal.3d 796 [251 Cal.Rptr. 202, 760 P.2d 399], the Supreme Court faced a situation where one commercial entity was seeking total equitable indemnification from another on a strict liability theory but the issue in that case was whether such a claim was barred by a good faith settlement.

Hallcraft contends "only where *both defendants are joined* in the action and both have a duty to the plaintiff, the consumer, to provide a defect-free product" may a commercial entity-defendant be held liable for a portion of the loss on a strict liability theory. Hallcraft asserts here it cannot be sued for comparative equitable indemnity on a strict liability theory because Hallcraft had "no duty or liability" to the plaintiff.

Hallcraft confuses the concept of "duty" with the concept of an equitable allocation of loss among multiple defendants. There is no question that a manufacturer has a duty, i.e., a responsibility, to provide consumers with defect-free products; that duty underlies strict product liability. The duty exists independently of any lawsuit filed by a consumer; a consumer's lawsuit does not create the manufacturer's duty, rather it seeks to enforce that preexisting duty and to recover damages for its breach. The lack of a lawsuit by a consumer is not equivalent to a determination that the manufacturer owed no duty to the consumer or that the manufacturer had no responsibility for injuries caused by the defective product on a strict liability theory. The lack of a lawsuit by the plaintiff does not act as a bar to a complaint for equitable indemnity which seeks to make such determinations. To adopt Hallcraft's position limiting apportionment on a strict liability basis to cases where the plaintiff has joined all defendants in his action would tend to negate an important aspect of the doctrine of comparative equitable indemnity as adopted by our Supreme Court.

Our Supreme Court has explained plaintiffs "no longer have the unilateral right to determine which defendant or defendants should be included in an action" under the comparative equitable indemnity doctrine. (*Evangelatos* v. *Superior Court, supra,* 44 Cal.3d 1188, 1197; *Allen* v. *Southland Plumbing, Inc.* (1988) 201 Cal.App.3d 60, 64 [246 Cal.Rptr. 860] [stating the plaintiff "had 'no right to single out'" a particular defendant "to bear all the loss"].) As part of the comparative equitable indemnity doctrine, a defendant who is sued has a right to bring in other tortfeasors who are allegedly responsible for plaintiff's action through a cross-complaint or by a separate complaint for equitable indemnification. (*Ibid.; Valley Circle Estates* v. *VTN Consolidated, Inc.* (1983) 33 Cal.3d 604, 612 [189 Cal.Rptr. 871, 659 P.2d 1160]; *People* ex rel. *Dept. of Transportation* v. *Superior Court* (1980) 26 Cal.3d 744, 752 [163 Cal.Rptr. 585, 608 P.2d 673].)

Hallcraft's theory would undermine the right of a defendant to seek apportionment of loss through a separate action for equitable indemnity; Hallcraft would place a defendant's right to equitable indemnity at the mercy of the plaintiff's pleadings and the fortuity of consolidation of cross-complaints for trial with the plaintiff's action. Such a result is inconsistent

with Supreme Court language and the purpose of comparative equitable indemnity.

■■■ Hallcraft sees GEM's action for equitable indemnification as being nothing more than a claim by one business against another business for a business loss, a loss which differs from that suffered by a consumer to which strict liability may apply. This reasoning ignores the origin of the loss. GEM's claim for equitable indemnification derives from the Association's loss and award of damages. Whether a defendant is held directly to the consumer/plaintiff for the plaintiff's loss or is held indirectly liable through a complaint for equitable indemnity, it is the same loss that is being apportioned—the loss suffered by the plaintiff/consumer. We conclude any theory which would have been available to the Association in a direct action against Hallcraft and upon which basis loss could have been apportioned in the Association's action is available to GEM here seeking equitable indemnification.[2] Accordingly, before GEM's assignment to the Association of indemnity rights against Hallcraft, GEM bore the burden of establishing strict liability constituted a theory available to the Association against Hallcraft upon which the Association would have prevailed, as well as apportionment.

The trial judge here attempted to distinguish the *Safeway* case as follows: " . . . I think there's a difference between the indemnity arising out of the relationship between a retailer who does absolutely nothing with the product except get it in a box from the manufacturer and pass it along. They're liable in strict liability in tort to the buyer. No question. And they would have a right of have indemnity from—total indemnity, and the case[s] have held this, total indemnity, retailer from manufacturer . . . .

"Here, as I see it, there's no way that GEM can put itself in the position that that retailer is in to obtain indemnity under any theory from Hallcraft. They simply are not the conduit of a totally manufactured product that just zips on into the hands of the buyer and the public as user and buyer of a completed product."

■■■ As we explained in *Standard Pacific of San Diego* v. *A.A. Baxter Corp.* (1986) 176 Cal.App.3d 577, 587-588 [222 Cal.Rptr. 106]: "Comparative equitable indemnity includes the entire range of possible apportion-

---

[2] Note *Jaffe* v. *Huxley Architecture* (1988) 200 Cal.App.3d 1188, 1192 [246 Cal.Rptr. 432]: "What is important is the relationship of the tortfeasors to the plaintiff and the interrelated nature of the harm done. [Citation.] It would be unfair to require one tortfeasor to bear a loss disproportionate to his relative culpability simply because a tortfeasor who contributed to the loss owed a duty to the plaintiff but not to the defendant."

ments, from no right to any indemnity to a right of complete indemnity. Total indemnification is just one end of the spectrum of comparative equitable indemnification." Thus, distinguishing a right to equitable indemnity based on whether the claim is for "total" rather than "partial" indemnity is a false distinction; equitable indemnification is equitable indemnification no matter what percentage of loss is sought to be allocated to another. This position was recently affirmed by the Supreme Court in *Far West Financial Corp.* v. *D & S Co., supra,* 46 Cal.3d 796, 808.

██ ██ In light of the clear Supreme Court language favoring apportionment of loss among those responsible for the harm on a comparative fault basis, its language granting defendants a right to seek equitable indemnity from parties not named by the plaintiffs through filing a cross-complaint for equitable indemnification, and its language approving apportionment of loss when strict liability is involved, we conclude a defendant/indemnitee may in an action for indemnity seek apportionment of the loss on any theory that was available to the plaintiff upon which the plaintiff would have been successful. To do otherwise, would mean a defendant/indemnitee's right to an allocation of the loss for comparative responsibility on a strict liability theory would be subject to the vagaries of plaintiff's pleading and joinder of cross-complaints. To bar an action on a strict liability theory because of these technical distinctions in pleading and procedure demeans the purpose of comparative equitable indemnity, i.e., an equitable sharing of loss between multiple tortfeasors in proportion to their relative culpability. We conclude the trial court erred in granting judgment on the pleadings on the basis GEM could not seek equitable indemnity on a strict liability theory.

## II

### *Joint Tortfeasor*

██ Hallcraft contends it was not subject to a claim for equitable indemnity by GEM because it was not a joint tortfeasor with GEM.

" '[T]here can be no indemnity without joint and several liability by the prospective indemnitor and indemnitee . . . .' " (*Home Budget Loans, Inc.* v. *Jacoby & Meyers Law Offices* (1989) 207 Cal.App.3d 1277, 1286 [255 Cal.Rptr. 483]; *Cicone* v. *URS Corp.* (1986) 183 Cal.App.3d 194, 212 [227 Cal.Rptr. 887]; *Munoz* v. *Davis* (1983) 141 Cal.App.3d 420, 425 [190 Cal.Rptr. 400].)

Hallcraft argues it is not a joint or concurrent tortfeasor with GEM because Hallcraft was not sued as a joint tortfeasor in the Association's

action. This argument is a variation of the first, i.e., that the defendants must be held jointly liable in the plaintiff's action through apportionment of the loss by the trier of fact. As discussed previously, joinder by the plaintiff is not a prerequisite to a defendant's right to equitable indemnification.

The term "joint tortfeasor" as used in the comparative equitable indemnity context does not mean the defendants were "joined" as tortfeasors by the plaintiff; it is a broad term which includes joint, concurrent and successive tortfeasors. (See *Considine Co.* v. *Shadle, Hunt & Hagar* (1986) 187 Cal.App.3d 760, 767 [232 Cal.Rptr. 250].) "Where the transaction rests upon related facts, either concurrent or successive, joint or several, which legally create a detriment compensable against multiple actors, the right of indemnity should follow [*American Motorcycle Assn.* v. *Superior Court, supra,* 20 Cal.3d 578] guidelines, unless a contract or statute otherwise provides." (*City of Sacramento* v. *Gemsch Investment Co.* (1981) 115 Cal.App.3d 869, 877 [171 Cal.Rptr. 764].)

Here, there were facts alleged that would support a finding Hallcraft was a joint tortfeasor with GEM, i.e., that the actions of Hallcraft and GEM combined to cause the Association's injury. (See *Kohn* v. *Superior Court* (1983) 142 Cal.App.3d 323, 329[191 Cal.Rptr. 78] [the actions of the defendants "combined to create one indivisible injury"]; see also *County of Riverside* v. *Loma Linda University* (1981) 118 Cal.App.3d 300, 314-316 [173 Cal.Rptr. 371] [rejecting an argument equitable indemnification imposed in a separate action could not be upheld on a joint tortfeasor theory because the entity had not been sued as a joint tortfeasor in the plaintiff's action].)

### III

### *Component Part*

 Hallcraft argues strict product liability theory does not apply to it because it had no part in producing a product, rather, it provided only "raw material."

 It is settled law in California that a developer who mass-grades land into finished lots for sale to the public for residential housing has produced a "product" and is strictly liable to the consumer for any defects in the design or manufacture of the lots. (*Avner* v. *Longridge Estates* (1969) 272 Cal.App.2d 607 [77 Cal.Rptr. 633]; see also *U.S. Financial* v. *Sullivan, supra,* 37 Cal.App.3d 5, 17.)

■ Strict liability may be imposed against a supplier of a product which is defective for its intended use even though the product may undergo processing or other substantial change. GEM points to the following example contained in the Restatement Second of Torts section 402A, comment p: "If, for example, raw coffee beans are sold to a buyer who roasts and packs them for sale to the ultimate consumer, it cannot be supposed that the seller will be relieved of all liability when the raw beans are contaminated with arsenic, or some other poison." (§ 402A, com. p, p. 357.)

Hallcraft counters by pointing to another example in the Restatement to which strict liability does not apply: "On the other hand, the manufacturer of pig iron, which is capable of a wide variety of uses, is not so likely to be held to strict liability when it turns out to be unsuitable for the child's tricycle into which it is finally made by a remote buyer." (Rest.2d Torts, § 402A com. p., p. 357.)

■ Ultimately, the question of whether Hallcraft sold a "product" (i.e., a tract of finished residential lots) or a "raw material" is a factual one. GEM's complaint contains allegations which would bring this case into the coffee bean example, i.e., that Hallcraft sold to GEM a product which was intended or designed and manufactured to be sold to the public after processing (building upon by GEM). These allegations would take Hallcraft out of the pig iron situation, i.e., Hallcraft's graded lots were products sold for a specific use (residential development) rather than being "capable of a wide variety of uses" as is pig iron and GEM was the intended buyer, not a "remote buyer."

Hallcraft's contentions that it only rough-graded the tract and that GEM did further grading and soils testing are factors which may reduce Hallcraft's share of the loss suffered by the Association, possibly even to zero, but these contentions do not nullify the factual question or support as a matter of law judgment on the pleadings.

■ Hallcraft also argues it is not liable on a strict products liability theory because it did not sell the lots directly to the public. It seeks to distinguish *Avner* v. *Longridge Estates, supra,* 272 Cal.App.2d 607 (upon which GEM and the Association heavily rely) because that case involved a direct sale by the developer/grader to the consumer whereas here Hallcraft sold the lots to GEM who built the residences which were subsequently sold to the public.

■ Strict products liability does not require a direct sale by the manufacturer to the consumer; the actual sale to the consumer may be made by a middleman such as a retailer. (See e.g., *Vandermark* v. *Ford Motor Co.*

(1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168].) ▮▮▮▮ Here, the theory of strict liability is that the developer "manufactured" (graded) a "product" (a finished residential lot) for ultimate sale to the public. It is alleged Hallcraft's product (the finished residential lot) was sold to the public along with a product manufactured by GEM (a condominium). In this situation, GEM can be viewed as a manufacturer of the condominium and a retailer not only of its own product (the structure) but also of Hallcraft's product (the lot).[3] Logically, there is no reason to allow strict liability in the situation when the grader/manufacturer sells directly to the public but disallow it when the grader/manufacturer sells indirectly to the public through a developer/builder who sells a structure in addition to the grader/manufacturer's lot. In either case, the grader/manufacturer has produced a product for ultimate sale to the public.[4] A number of cases have accepted this premise. (See, e.g., *Standard Pacific of San Diego* v. *A. A. Baxter Corp., supra,* 176 Cal.App.3d 577; *Far West Financial Corp.* v. *D & S Co., supra,* 46 Cal.3d 796.) Of course, this assumes Hallcraft, rather than GEM, was responsible for the finished residential lot that was sold to the consumer. As stated above, resolution of the question of whether Hallcraft sold to GEM a "product" or a "raw material" (or something in between) is a factual one.

We conclude the court erred in granting judgments on the pleadings.

## IV

### *Amendment of Cross-complaint*

The Association contends the trial court erred in denying it leave to amend its complaint in intervention. The trial court denied leave on the

---

[3] Of course, in some situations a residence may be bought separately from the land as in the case of a purchase of a mobilehome from a dealer which is intended to be moved to another location. It is also true that sometimes individuals purchase land containing a building but without any intent of retaining the building; their interest is only in the land itself as a site for a new and separate structure. In such a case, the individual's purchase is essentially of the underlying land rather than the structure. Here, however, we are addressing a situation where the consumer was purchasing both the structure and underlying land.

[4] It is a matter of significance in this case that Hallcraft, the grader, is alleged to have produced a finished product (the graded lots) which it then transferred to developers who constructed buildings on the lots. We do not suggest that subcontractors in a building project under the supervision of a developer, rendering services and producing only portions or phases of an ultimate finished product, may be strictly liable to the ultimate purchaser. This issue is treated in depth in our recently published opinion in *La Jolla Village Homeowners' Assn., Inc.* v. *Superior Court* (1989) 212 Cal.App.3d 1131 [261 Cal.Rptr. 146], which concluded generally that the typical subcontractor in a construction project is *not* subject to strict liability for defects in the final construction project.

basis that the proposed amended complaint would still be seeking equitable indemnity on a strict liability theory. Since we have concluded a claim here for equitable indemnity could be grounded on strict liability theory, we conclude the court should reconsider its decision denying leave to amend.

### DISPOSITION

The judgments are reversed.

Work, J., and Froehlich, J., concurred.

A petition for a rehearing was denied September 13, 1989, and respondent's petition for review by the Supreme Court was denied November 15, 1989.