[No. A075233. First Dist., Div. Four. May 5, 1997.]

BLACKHAWK CORPORATION, Plaintiff and Appellant, v.
GOTHAM INSURANCE COMPANY, Defendant and Respondent.

COUNSEL

James J. Matson, Miller, Starr & Regalia and Amy Matthew for Plaintiff and Appellant.

Derby, Cook, Quinby & Tweed, Jess B. Millikan and Jessica K. Lanning for Defendant and Respondent.

OPINION

ANDERSON, P. J.—In this insurance coverage case, we are asked to decide whether subsidence exclusions apply to preclude coverage of defective lot claims by homeowners against the developer of unimproved lots. Also at issue is whether the work of the building contractors that constructed the residential units and site improvements is attributable to the lot developer on a strict liability theory, thereby entitling the developer to coverage for property damage due to concurrent causes. We resolve both questions against the insured developer and, accordingly, affirm the summary judgment in favor of the insurer.

## I. BACKGROUND

Blackhawk Corporation (Blackhawk) is the developer of Blackhawk community, an affluent, gated residential community in Danville, Contra Costa County. Throughout the past 20 years Blackhawk's role has been to develop residential subdivisions and sell the residential lots to licensed building contractors. Blackhawk purchases the raw land; obtains necessary governmental approvals to subdivide the property; obtains a final subdivision map; and hires independent surveyors, engineers and contractors to design the subdivisions, plan lot layouts, conduct soils investigations and prepare foundation design recommendations. It also hires grading contractors to do the mass rough grading and construct the building lots, and then sells the lots, usually in bulk, to building contractors who build single family homes thereon. The builders in turn sell finished homes to home buyers. Construction work performed on Blackhawk's behalf by independent contractors has been limited to off-site infrastructure improvements (e.g., storm drains, utilities, roads) constructed in concert with development of the residential building pads.

Gotham Insurance Company (Gotham) insured Blackhawk under a series of five consecutive claims-made liability policies spanning the years 1988-1993. Each policy contained a clause excluding liability for property damage related to subsidence. Each policy also established a self-insured retention of $50,000 (increased to $100,000 for the final policy year).

During the period 1990-1992, seven home buyers sued Blackhawk and others, asserting defective lot claims based on settlement of their homes, earth movement, water intrusion and defective drainage. Each complaint included a cause of action for strict liability asserted against Blackhawk. Blackhawk tendered these claims to Gotham on time. Its defense and settlement expenditures exceeded the self-insured retention in all seven homeowner suits.

Gotham refused to defend or pay and Blackhawk sued.[1] Blackhawk argued that the subsidence exclusions only applied to work performed *by Blackhawk employees*, and because all grading and related work was performed by contractors, the clauses had no effect on the homeowner claims. Blackhawk also maintained that the homeowner losses resulted primarily from concurrent causes—in most cases, deficient lot drainage implemented by the builder. According to Blackhawk, this cause was not clearly and

---

[1]Gotham began the litigation with an action for declaratory relief in federal court. Ultimately the district court remanded the then consolidated matter to state court, where both parties filed motions for summary judgment.

unambiguously excluded from coverage, and Blackhawk was strictly liable to the ultimate consumer for the defective lot, without regard to fault or cause.

The court ruled that the subsidence exclusions "are clear and unambiguous and apply regardless of whether work is done by Blackhawk's employees or contractors working for it, precluding coverage for the seven lawsuits at issue. . . ." The court further held that the concurrent cause doctrine was not available to resurrect coverage because the concurrent causes upon which Blackhawk relied "are not attributable to and cannot result in liability to Blackhawk. . . ." Finally, since there was no coverage or potential coverage for any of the underlying actions, the court concluded the self-insured retention had not been exhausted. This appeal followed entry of summary judgment in Gotham's favor.

## II. Discussion

### A. *The Subsidence Exclusions Apply*

#### 1. *Background*

A word about the nature of the policies in question is in order. █ These are claims-made, general liability policies, which begin with a broad grant of coverage for damages because of "bodily injury" or "property damage" caused by an "occurrence." There then follow 13 exclusions detailing a myriad of circumstances which shift certain risks back to the insured. As a general matter, liability policies like these "are not designed to provide contractors and developers with coverage against claims their work is inferior or defective. [Citation.] The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer. [Citations.] Rather, liability coverage comes into play when the insured's defective materials or work cause injury to property other than the insured's own work or products. . . ." (*Maryland Casualty Co. v. Reeder* (1990) 221 Cal.App.3d 961, 967 [270 Cal.Rptr. 719].)

In the present case, the standard coverage grant between Gotham and Blackhawk was modified by a "subsidence exclusion" which, during the first four years, read: "It is agreed that this policy shall not apply to any liability for property damage caused by, resulting from, contributed to or aggravated by 'subsidence' and arising out of or attributable to any 'operations' of the insured. [¶] (a) For purposes of this endorsement 'subsidence' shall be defined as earth movement, including but not limited to earthquake, landslide, mudflow, earth sinking, earth rising or earth shifting. [¶] (b) For

purposes of this endorsement 'operations' shall be defined as any act, error or omission on the part of the insured, including but not limited to improper grading or site preparation, error in design, faulty materials or faulty workmanship."

For the fifth year the exclusion was revised to provide: "It is agreed that this policy shall not apply to any liability for property damage caused by, resulting from, contributed to, aggravated by or concurrently caused by 'subsidence' and arising out of or attributable to 'your work'. For purposes of this endorsement 'subsidence shall be defined as earth movement, including but not limited to earthquake, landslide, mudflow, earth sinking, earth rising or earth shifting. [¶] ALL OTHER TERMS AND CONDITIONS REMAINING UNCHANGED."

Both sides contend these provisions are clear and support their own position. We take a fresh look at them, aided by the now familiar rules governing interpretation of insurance contracts. The overriding goal of contract interpretation is to give effect to the parties' mutual intentions as of the time of contracting. (Civ. Code, § 1636.) Where contract language is clear and explicit and does not lead to an absurd result, we ascertain this intent from the written provisions and go no further. (Civ. Code, §§ 1638, 1639; *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) "The words of a contract generally are to be understood in their ordinary and popular sense unless the parties use them in a technical sense or a 'special meaning is given to them by usage . . . .' (Civ. Code, § 1644.)" (*Helfand* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869, 879 [13 Cal.Rptr.2d 295].)

■ A provision in an insurance contract is ambiguous if it is capable of more than one reasonable construction. However, courts will not strain policy language to create an ambiguity or label a provision ambiguous simply by isolating phrases and considering them in the abstract. Instead, we construe provisions in relation to the whole of the instrument, each clause giving meaning to the other. (*Helfand* v. *National Union Fire Ins. Co., supra,* 10 Cal.App.4th at p. 880.)

### 2. *Analysis*

■ As to the initial subsidence clause, Blackhawk urges that because the only entities identified in the policy as "the insured" are Blackhawk and its related companies, the plain meaning of the exclusion is that it does *not* pertain to acts of independent contractors. We disagree. The clause applies to damage "attributable to any 'operations' of the insured."

First, the term "operations" is defined as "any act, error or omission on the part of the insured, including but not limited to improper grading or site preparation . . . ." While it is undisputed that Blackhawk's employees did not perform the actual lot preparation work which allegedly contributed to the subsidence damage, it is also undisputed that the independent contractors were performing the work in question under contract to Blackhawk, for Blackhawk's benefit. In other words, *Blackhawk did its grading and other site preparation work through independent contractors*. Thus, while it is true that the contractors were not named insureds, their work was thus "attributable to" the operations of the insured.

So, too, the contractors' acts or omissions were acts or omissions "on the part of the insured." "[O]n the part of" means: "on the side of: with regard to or so far as concerns the one specified . . . ." (Webster's New Internat. Dict. (3d ed. 1965) p. 1645.) Certainly, the work of the contractors was done "with regard to" or "so far as concerns" Blackhawk.

Nonetheless, Blackhawk argues that because the subsidence exclusion provides that all other terms and conditions remain unchanged, the exclusion as interpreted must be consistent with those terms, and it is not. We agree with the premise but not with the conclusion.

Blackhawk points to the standard exclusion "L" for " '[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products completed operations hazard.' " The "products and completed operations" hazard refers to liability for accidental bodily injury or property damage following the completion of the insured's operations, e.g., completion of construction. (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1996) ¶ 7:1430 rev. #1, 1996.)

In this case, the exclusion for completed operations then *exempts* work done by subcontractors, stating: "This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."

Blackhawk seems to be submitting that because exclusion "L" specifically mentions subcontractors, the subsidence exclusion should do the same and in any event should use similar wording, i.e., the "performed on your behalf" language. We do not agree. Exclusion "L" is *giving back* coverage for completed operations where the work was performed by subcontractors. On the other hand, the subsidence clause *withdraws* coverage for subsidence claims attributable to any act, error or omission "on the part of Blackhawk."

While it would be neater to have parallel wording, the fact that the subsidence exclusion is phrased somewhat differently from exclusion "L"

does not make it fatally inconsistent with that clause, given the common-sense meaning of the words that are used and the different purposes of the two clauses. Indeed, what exclusion "L" tells us is that when the parties wanted to provide coverage for otherwise excluded work performed by contractors, they knew how to craft appropriate wording. That similar language was omitted from the subsidence exclusion indicates an intention for the exclusion to apply across to the board to the insured and contractors working on the part of the insured.

Moreover, the subsidence exclusion is not part of the standard, boilerplate policy. Rather, it is a specially drafted endorsement. An unambiguous endorsement prevails over general language in the body of the printed policy. (*Jane D.* v. *Ordinary Mutual* (1995) 32 Cal.App.4th 643, 651 [38 Cal.Rptr.2d 131].)

Blackhawk further urges that the lower court's construction of the subsidence clause "gutted and rendered illusory the protection afforded" under the policy. The argument is this: The completed operations coverage, as modified by exclusion "L," affords coverage to an insured for the negligent acts and omissions of its subcontractors if the occurrence took place after the affected property was sold. If the subsidence exclusion extends to Blackhawk's independent contractors, then the completed operations coverage is illusory, given the nature of Blackhawk's business as developer of raw land. What Blackhawk ignores is its potential liability for other risks that could pertain to the work of a lot developer, e.g., soil contamination, purchase, sale and subdivision of the lots, surveys, off-site infrastructure, etc.

Blackhawk also calls our attention to *Maryland Casualty Co.* v. *Reeder*, a case involving a policy which eliminated the standard exclusion for property damage to work performed "by or on behalf of the named insured" and replaced it with a broad form endorsement. The new endorsement dropped the "or on behalf of" language, thereby limiting the exclusion to work performed "by the named insured . . . ." With this endorsement, the contractor regained coverage for his or her completed work when the damage arose from work performed by someone else, such as a subcontractor.[2] (*Maryland Casualty Co.* v. *Reeder, supra*, 221 Cal.App.3d 961, 971-972, boldface type & italics omitted.)

---

[2]Under *Maryland Casualty*, there is no question that the fifth year subsidence exclusion eliminated coverage for subsidence damages caused by the work of independent contractors. That clause excluded property damage caused by subsidence and attributable to "Your work." "Your work" appears in quotes to denote its status as a defined term. The policy defines "Your work" as "work or operations performed *by you or on your behalf* . . . ." (Italics added.) Blackhawk contends this modified exclusion nonetheless does not embrace work of the contractors because exclusion "L" of the policy gives back completed operations coverage if the damaged work was performed by the subcontractor. We have already refuted this

We are not sure to what end Blackhawk is aiming in its lengthy discussion of this case. For our part, *Maryland* says there is a big difference between work performed by the insured and work performed by or on behalf of the insured. The former is restricted to work that the insured itself performs. The latter encompasses work performed by others for the insured. *Maryland*'s analysis is consistent with our analysis of the subsidence exclusion.

In a further effort to bolster the inconsistent provisions argument, Blackhawk also draws our attention to endorsements 6 and 7. Through endorsement 6, "SUBCONTRACTOR CERTIFICATE WARRANTY," Blackhawk warrants that when it hires any subcontractor, it will obtain a certificate of insurance evidencing general liability insurance of a certain amount. Endorsement 7, "ADDITIONAL INSURED" refers to "[o]perations performed for the Additional Insured by the <u>Named Insured</u>" and "acts or omissions of the Additional Insured in connection with his general supervision of such operations." (Emphasis in original.)

These endorsements have nothing to do with the subsidence exclusion. Nor do we see any inconsistency in the use of words or phrases in these endorsements when compared with the subsidence exclusion.

Finally, we respond to Blackhawk's concern that the trial court erred in admitting parol evidence on the issue of the intention of the parties with respect to the subsidence exclusions, after finding these provisions clear and unambiguous. The extraneous evidence included preliminary correspondence between agents for Blackhawk and Gotham indicating Blackhawk's substantial past losses from subsidence and noting that conditions of insurance would exclude subsidence. Blackhawk submitted an opposing declaration wherein the president of Blackhawk stated that based on past experience with prior claims and prior policies and carriers, Blackhawk concluded it was covered for subsidence claims if the damage arose out of work performed on its behalf by contractors. Further, Gotham never explained that the exclusion extended to contractors' work.

We agree with Blackhawk that where the language of a contract is clear, we ascertain intent from the plain meaning of its terms and go no further. Of course, Blackhawk does not share our construction of the plain meaning of the subsidence clauses. In any event there was no need for the court to resort to parol evidence. That it did is harmless error.

B. *The Concurrent Cause Doctrine Is Not Available to Blackhawk*

In *State Farm Mut. Auto. Ins. Co. v. Partridge* (1973) 10 Cal.3d 94, 102 [109 Cal.Rptr. 811, 514 P.2d 123] our Supreme Court held that where a

---

argument, above. Without question the independent contractors performed their work on Blackhawk's behalf.

liability insurance policy provides coverage for a loss jointly caused by an insured risk and an excluded risk, the risks constitute concurrent proximate causes of the loss. So long as one of the causes is covered by the policy, the insurer is liable.

■    Blackhawk seeks to find coverage under this doctrine on the theory that in the underlying actions, the homeowners asserted causes of action against it for strict liability for defective lots. Blackhawk's premise is that a developer will be deemed strictly liable for any defective conditions in a lot regardless of whether the defect existed at the time the developer sold the lot to the builder. This is not the law.

In *Avner* v. *Longridge Estates* (1969) 272 Cal.App.2d 607 [77 Cal.Rptr. 633] homeowners sued the tract developer of residential lots for damages after the rear slope of their lot failed. Homeowners alleged that defendants manufactured the lots by cutting, grading, filling and compacting for the purposes of sale to the public and construction of a home thereon; the manufacturing process was defective in that it had inadequate provision for drainage; and the soil had not been adequately compacted. The reviewing court held that the manufacturer of a lot may be strictly liable for damages suffered by the homeowner as a result of any defect in the manufacturing process. (*Id.*, at p. 615.)

Then in *GEM Developers* v. *Hallcraft Homes of San Diego, Inc.* (1989) 213 Cal.App.3d 419 [261 Cal.Rptr. 626] another layer was added to the strict liability analysis. There the lot "developer 'manufactured' (graded) a 'product' (a finished residential lot) for ultimate sale to the public," and this product was sold to the public along with the building contractor's product, namely, a condominium. (*Id.*, at p. 433.) The builder sought comparative equitable indemnity against the lot developer on a theory of strict liability. The issue on appeal boiled down to whether the lot developer was responsible for the finished residential lot that was sold to the consumer. Resolution of that question was factual, turning on whether the lot developer sold the builder a product, raw material, or something in between. (*Ibid.*)

The reviewing court noted that a supplier of a product which is defective for its intended use may be subject to strict liability even though the product may undergo processing or other substantial change. (*GEM Developers* v. *Hallcraft Homes of San Diego, Inc., supra*, 213 Cal.App.3d at p. 432.) Comment p, page 357, of the Restatement Second of Torts section 402A, referenced in *GEM Developers*, has this to say on the subject: "If, for example, raw coffee beans are sold to a buyer who roasts and packs them for sale to the ultimate consumer, it cannot be supposed that the seller will be

relieved of all liability when the raw beans are contaminated with arsenic, or some other poison. . . . On the other hand, the manufacturer of pig iron, which is capable of a wide variety of uses, is not so likely to be held to strict liability when it turns out to be unsuitable for the child's tricycle into which it is finally made by a remote buyer. The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes. . . ."

The *GEM* court concluded that the allegations in the complaint brought this case into the coffee bean example, not the pig iron situation. In responding to the developer's contention that it only rough-graded the tracts and that the builder undertook further grading and soils testing, the court concluded these "are factors which may reduce [the developer's] share of the loss suffered by the [homeowner], possibly even to zero, but these contentions do not nullify the factual question or support as a matter of law judgment on the pleadings." (*GEM Developers* v. *Hallcraft Homes of San Diego, Inc., supra,* 213 Cal.App.3d at p. 432.)

California courts also adhere to the rule that the manufacturer of a completed product cannot escape liability by tracing the defect to a component part supplied by someone else. If the manufacturer of a completed product delegates some part of the manufacturing process to a third party, he or she will still be liable to the consumer for harm from dangerous defects regardless of the delegation. (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 261 [37 Cal.Rptr. 896, 391 P.2d 168].)

We examine Blackhawk's responsibility to the homeowners with these principles in mind. First, there is no question that Blackhawk sold lots—finished products—to the building contractors and is strictly liable for any defects in the lots which it manufactured and sold. But the subsidence exclusion eliminates coverage for damages for defects in the lots which Blackhawk manufactured and sold. What remains are damages for installation of faulty drainage systems, defective foundations, etc., work which falls under the responsibility of the builders. The builders, too, manufactured and sold a finished product—the home with site improvements.

If the lots were not defective when sold to the builders, Blackhawk is not on a par with seller of roasted—and contaminated—coffee beans. Nor is Blackhawk on a par with the developer in *Avner*, because there the crucial allegation was that *the lot manufacturing process was defective*. Nor is Blackhawk on a par with the defendant in *Vandermark*, because this is not a case of delegating part of the manufacturing process to another. Blackhawk's responsibility ended with the sale of the lots to the builder. For defects in

that product, it was responsible. For defects in the builder's product, it was not. The builder shoulders responsibility for discovering and preventing dangerous defects in his or her work product. (See Rest.2d Torts, *supra*, § 402A, com. p, p. 457.)

Were it not for the subsidence exclusion, which forces us to separate Blackhawk's product from the builder's product, the case would be in a *GEM* situation, focusing on the factual issue of what share of the loss, if any, is attributable to the rough-graded tract as opposed to the finished home with various site improvements. However, that is irrelevant here because there is no coverage for damages from the rough-graded tract and, to the extent the builder is responsible for a share of the loss, Blackhawk's strict liability ends.

## III. Disposition

There are no triable issues of material fact as to coverage or potential coverage, and that being the case, the self-insured retention has not been exhausted. We affirm the summary judgment.

Poché, J., and Reardon, J., concurred.

A petition for a rehearing was denied June 4, 1997, and appellant's petition for review by the Supreme Court was denied August 13, 1997.