[No. G015484. Fourth Dist., Div. Three. Aug. 21, 1997.]

CITY OF HUNTINGTON BEACH, Cross-complainant, Cross-defendant and Appellant, v.
CITY OF WESTMINSTER, Cross-defendant, Cross-complainant and Appellant.

## COUNSEL

Moore & Rutter and Mark D. Rutter for Cross-complainant, Cross-defendant and Appellant.

Richard D. Jones and Theodore A. Anderson for Cross-defendant, Cross-complainant and Appellant.

## OPINION

**CROSBY, J.**—For $250,000 the Cities of Huntington Beach and Westminster settled a lawsuit brought by a robbery victim who was accidentally bitten by a police dog,[1] but the cities could not agree on an allocation of the loss between them. The trial court somehow found neither city at fault, but nonetheless applied the doctrine of equitable indemnity to require one city to completely indemnify the other. "That dog," as we say out west, "won't hunt."

There is no equitable basis for a total shifting of a loss from one fault-free party to another. The cities have not cited any statute or agreement to justify such a judicial redistribution of liability. As the court noted in *Gentry Construction Co.* v. *Superior Court* (1989) 212 Cal.App.3d 177, 180 [260 Cal.Rptr. 421], in refusing to allow one strictly liable codefendant to recover full indemnity from a second strictly liable codefendant, " 'Judicial paternalism is to loss shifting what garlic is to a stew—sometimes necessary to give full flavor to statutory law, always distinctly noticeable in its result, overwhelmingly counterproductive if excessive, and never an end in itself.' "

We will conclude the statutory right of contribution (Code Civ. Proc., § 875) requires the cities to share the burden of the judgment equally between them. Pro rata contribution is precisely the type of obvious practical solution that could (and should) have avoided this needless municipal dogfight and rabid mutilation of public resources.

I

On March 12, 1991, shortly before 11 p.m., Huntington Beach police officers responded to a report of an armed robbery in progress at a local restaurant. In accordance with an "informal mutual assistance pact," police in the adjoining Cities of Westminster and Fountain Valley also were notified and dispatched assistance.

Huntington Beach Sergeant Anthony Sollecito took command of the crime scene. The armed suspects were believed to have fled to another restaurant in

---

[1]Well, it was no "accident" on the dog's part.

the same shopping center. To determine whether others were hiding in the trash bin area behind the second establishment, Sollecito requested a canine unit. The Huntington Beach dog handler was off duty, however, and unavailable for at least an hour. A Westminster sergeant volunteered the services of his city's canine officer, Robert Fowks, and his dog, "Xello," who were at the scene.

Not knowing whether there was another way out of the trash bin enclosure, Fowks asked Sollecito whether the area was "secure." Sollecito thought the question was whether police officers were positioned around the perimeter of the crime scene and replied, "Yes." It turned out the trash bin area was not enclosed; neither officer knew that. Accordingly, Fowks deployed the stalwart Xello without a leash. The dog went into the trash area, but exited through the rear.

Xello ran past several other police officers, two handcuffed suspects, and right up to one of the robbery victims, Mary McCarty-Devlin, who was seated outside and sobbing. Xello attacked and severely bit her. He refused to loosen his grip until Fowks arrived and forced him to do so.

In April 1993, the cities, neither admitting liability, settled McCarty-Devlin's action for a total of $250,000. The court entered judgment pursuant to the stipulated settlement, holding both cities jointly and severally liable. That, of course, should have been the end of it.

Several months later, however, the cities tried their respective indemnity cross-complaints before a judge. The trial consumed three days of valuable courtroom time. The judge heard testimony from Sollecito, Fowks, several other police eyewitnesses, and experts on police dog handling and training.

The judge found "no negligence on the part of any employee of the Huntington Beach Police Department nor of the Westminster Police Department. [Sergeant] Sollecito, Officer Muller and Officer Fowks acted reasonably under an emergency situation." But he ordered Huntington Beach to bear 100 percent of the responsibility because "[u]sing Xello lessened the exposure of Huntington Beach officers to deadly harm thereby greatly benefiting that city. There was no benefit to the City of Westminster in the use of Xello." The court concluded, "By asking for assistance and using that assistance, the requesting agency should bear the financial responsibility for unfortunate and unforeseen consequences of the inherent risk of police activities which are not caused by the assisting agency's negligence."

The court signed and filed a statement of decision and entered judgment in favor of Westminster. Huntington Beach filed a timely notice of appeal from

the judgment on the cross-complaints and the order denying its posttrial motion to vacate the judgment. Typical of this litigation, Westminster cross-appealed from the judgment in its favor.[2]

## II

The cities do not challenge the superior court's factual findings that neither was directly responsible for the incident, whether by negligent deployment of the animal, miscommunication, or by some bungled division of responsibility. The record reveals no contractual agreement between Huntington Beach and Westminster concerning allocation of fault and no evidence regarding any purported "benefit" from one city to the other. We must therefore proceed on the dubious premise that both cities were fault-free and that each, at most, was derivatively or vicariously liable for the incident.

■ Rather than recognizing different forms of equitable indemnity, California has but a single comparative indemnity doctrine "which permits partial indemnification on a comparative fault basis in appropriate cases." (*Far West Financial Corp.* v. *D & S Co.* (1988) 46 Cal.3d 796, 808 [251 Cal.Rptr. 202, 760 P.2d 399].) Comparative equitable indemnity includes the entire range of possible apportionments—from no indemnity to total indemnity. Rather than being different in kind from comparative indemnity, total equitable indemnity is merely a possible result at one end of the spectrum when one party bears 100 percent of the fault and another bears none. Even with a total shifting of loss, "the indemnitee's equitable indemnity claim does not differ in its fundamental nature from other comparative equitable indemnity claims." (*Ibid.*)

At the heart of the doctrine is apportionment based on fault. At a minimum equitable indemnity "requires a determination of *fault* on the part of the

---

[2]Westminster's cross-appeal is frivolous. It seeks nothing more than an advisory opinion. Westminster is not "aggrieved" by a judgment in its favor. (*Nevada County Office of Education* v. *Riles* (1983) 149 Cal.App.3d 767, 779 [197 Cal.Rptr. 152].)

One speculates that the parties simply lost perspective in pursuing the litigation this far, rather than compromising with each other after plaintiff was compensated. (See also *post,* fn. 4.) While we recognize this lawsuit is a unique puppy in the field, it hardly justified the boarding costs. Given the fiscal and other constraints under which our overburdened political institutions operate, we hold no brief for either side in championing a cause that "chases itself in circles." (*Poland* v. *Department of Motor Vehicles* (1995) 34 Cal.App.4th 1128, 1134 [40 Cal.Rptr.2d 693].)

In this county of dozens of municipalities, it seems obvious that the various mutual aid pacts need to be supplemented with agreements for shared liability and joint legal representation in cases such as these. Litigation, and the acrimony it can breed, are obviously undesirable between neighboring cities.

alleged indemnitor . . . ." (*Coca-Cola Bottling Co.* v. *Lucky Stores, Inc.* (1992) 11 Cal.App.4th 1372, 1378 [14 Cal.Rptr.2d 673], italics added.) Apportionment of fault is permitted even against a vicariously or derivatively liable defendant when other factors indicate that the vicariously liable defendant "may also bear some direct responsibility for an accident, either on the basis of its own action—for example, the negligent hiring of an agent—or of its own inaction—for example, the failure to provide adequate supervision of the agent's work." (*Far West Financial Corp.* v. *D & S Co.*, *supra*, 46 Cal.3d at p. 812.)

The trial court found none of these circumstances applied here. Neither city was determined to be more directly culpable than the other. To employ Justice Kaufman's terminology, there was no "fault-source" defendant between Westminster and Huntington Beach. (46 Cal.3d at p. 819 (conc. and dis. opn. of Kaufman, J.).) While the cities may have entered into their $250,000 settlement anticipating that one of them would be branded a "fault-source tortfeasor" at the subsequent indemnity trial, the judge did not so find. In the absence of any agreement between the parties, that determination precludes *either* from obtaining an indemnity against the other. We know of no decision permitting a court to impose an all-or-nothing indemnity judgment in favor of one fault-free party and against another fault-free party based on an ad hoc view of the "equities."

By allocating liability according to principles of comparative fault, the doctrine of equitable indemnity is designed to avoid the unfairness of holding one defendant liable for a plaintiff's entire loss "while allowing another responsible defendant to escape 'scot free.'" (*GEM Developers* v. *Hallcraft Homes of San Diego, Inc.* (1989) 213 Cal.App.3d 419, 426 [261 Cal.Rptr. 626].) The trial court's decision has achieved precisely the opposite result. It permits Westminster to avoid responsibility for a dog bite inflicted by its police dog under the control of its employee, Fowks, while its equally fault-free codefendant Huntington Beach is tagged with the entire liability.

We fail to see any fairness or equity in this. The uncontradicted evidence shows the Westminster officer had the ultimate decision to deploy Xello and to control his use. While Huntington Beach may have been the direct beneficiary of the dog's employment, we think Westminster benefited as well. Criminals are not constrained by municipal boundaries, nor are potential victims. The armed robbery suspects easily could have fled into neighboring Westminster, and its residents did benefit from learning of its hired hound's dangerous propensities on a foray on foreign turf.

Courts should be reluctant to impose all-or-nothing liability in municipal aid situations without some direction and guidance from the involved cities

themselves or the Legislature. In *New Hampshire Ins. Co.* v. *City of Madera* (1983) 144 Cal.App.3d 298, 308 [192 Cal.Rptr. 548], the court refused to imply unexpressed promises into a mutual aid agreement between a city and county as "contrary to public policy since it would discourage cities and counties from entering into mutual aid agreements due to the possibility of creating a civil liability that otherwise would not exist." So it is here.

In a howler of a "lawyer's argument" Huntington Beach relies on the dog bite statute, Civil Code section 3342, to shift all responsibility to Westminster. The statute imposes strict liability on dog owners based on an expressed policy preference to require them to compensate innocent bite victims.[3] It is silent on the subject of indemnity between a dog owner and a codefendant once the innocent victim has been made whole. Since the statute's purposes have been achieved, we do not further consider the point here.[4]

---

[3]Civil Code section 3342 provides in pertinent part: "(a) The owner of any dog is liable for the damages suffered by any person who is bitten by the dog while in a public place or lawfully in a private place, including the property of the owner of the dog, regardless of the former viciousness of the dog or the owner's knowledge of such viciousness. A person is lawfully upon the private property of such owner within the meaning of this section . . . when he is on such property upon the invitation, express or implied, of the owner. [¶] (b) Nothing in this section shall authorize the bringing of an action pursuant to subdivision (a) against any governmental agency using a dog in military or police work if the bite or bites occurred while the dog was defending itself from an annoying, harassing, or provoking act, or assisting an employee of the agency in any of the following: [¶] (1) In the apprehension or holding of a suspect where the employee has a reasonable suspicion of the suspect's involvement in criminal activity. [¶] (2) In the investigation of a crime or possible crime. [¶] (3) In the execution of a warrant. [¶] (4) In the defense of a peace officer or another person. [¶] (c) Subdivision (b) shall not apply in any case where the victim of the bite or bites was not a party to, nor a participant in, nor suspected to be a party to or a participant in, the act or acts that prompted the use of the dog in the military or police work. [¶] (d) Subdivision (b) shall apply only where a government agency using a dog in military or police work has adopted a written policy on the necessary and appropriate use of a dog for the police or military work enumerated in subdivision (b)."

[4]In terms of vapidity, Huntington Beach's arguments on the dog bite statute fail to take best in show. (See *ante*, fn. 2.) The blue ribbon goes to Westminster. Its cross-appeal asks us to establish (for reasons unrelated to this indemnity dispute) that McCarty-Devlin was a "party or participant" in the robbery, thereby falling outside the persons intended to be protected by Civil Code section 3342. (See Civ. Code, § 3342, subd. (c).) Westminster contends she was "integrally involved in the criminal activity" because she "called the police to the scene, followed the police to another location searching for her husband [and] elected to remain within the crime scene perimeter for nineteen minutes prior to release of the dog."

Westminster is "simply barking up the wrong judicial tree." (*Knickerbocker* v. *City of Stockton* (1988) 199 Cal.App.3d 235, 240 [244 Cal.Rptr. 764].) Its argument is spurious, infuriating in fact, and contemptible in law. McCarty-Devlin unquestionably was an "innocent passerby" and is as much entitled to the benefit of the dog bite statute as any other person who was lawfully at the scene of the crime. We are sure Westminster police officers know the difference between suspects and victims, even if their private counsel apparently do not.

## III

As joint judgment debtors in a tort action, Huntington Beach and Westminster each has a right of contribution against the other. Thus, the burden of the $250,000 judgment must be distributed equally between the two. (Code Civ. Proc., § 875 et seq.) Huntington Beach itself argues its maximum exposure to Westminster is its $125,000 contribution share.

*Coca-Cola Bottling Co.* v. *Lucky Stores, Inc., supra,* 11 Cal.App.4th 1372 is instructive. In *Coca-Cola* the court affirmed a contribution order against a supermarket that prevailed on summary judgment in a bottling company's action for equitable indemnity. The court held the prior denial of indemnification did not resolve the bottling company's "separate and distinct" claim for statutory contribution. It stated, ". . . when one of two or more tortfeasors satisfies a judgment entered jointly against both, and without apportionment of fault between them, such tortfeasor is entitled to seek statutory contribution even though a claim for equitable indemnity had been previously denied." (*Id.* at p. 1374.)

*Coca-Cola* is the real thing: As in *Coca-Cola,* the judge should have ordered Huntington Beach and Westminster to each pay half the judgment, since neither has a right to comparative or equitable indemnification based on the court's own findings. Much litigation time and trouble (including our own) could have been avoided had the participants agreed to split the difference, precisely as envisioned by the plaintiff's judgment, the contribution statute, and common sense.

The judgment is reversed with directions to proceed in accordance with this opinion, and the cross-appeal is dismissed. Each party shall bear its own costs.

Wallin, Acting P. J., and Rylaarsdam, J., concurred.