[No. B150551. Second Dist., Div. Four. Nov. 1, 2001.]

UNITED SERVICES AUTOMOBILE ASSOCIATION, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JOHN MOORE et al., Real Parties in Interest.

COUNSEL

Robie & Matthai, James R. Robie, Pamela E. Dunn, Natalie A. Kouyoumdjian and Andrea M. Cefaloni for Petitioner.

No appearance for Respondent.

Bishton & Gubernick, Norris J. Bishton, Jr., Jeffrey S. Gubernick and Debra Hartman Warfel for Real Party in Interest John Moore.

Haight, Brown & Bonesteel, Roy G. Weatherup, Peter Q. Ezzell, Caroline E. Chan, Nancy E. Lucas, and Ashley M. Silberfeld for Real Parties in Interest Daniels, Baratta & Fine, John P. Daniels, Inc., John P. Daniels, James M. Baratta, Paul R. Fine, Nathan B. Hoffman, Mary Hulett, James I. Montgomery, Jr., Lance D. Orloff, Mark R. Israel and Michael N. Schonbuch.

OPINION

VOGEL (C. S.), P. J.—

### INTRODUCTION

United Services Automobile Association (USAA) filed a petition for a writ of mandate challenging the trial court's determination that a sliding scale settlement agreement between the real parties in interest John Moore and his former attorneys Daniels, Baratta & Fine (DBF)[1] was made in "good faith" pursuant to Code of Civil Procedure section 877.6.[2]

We grant the petition. The consideration paid for the settlement consisted of a noncontingent $1 million and an interest-free loan of $3.5 million repayable only upon the contingency of its recovery from the nonsettling tortfeasor. Nevertheless, the settlement agreement provided that the value to

---

[1]The caption of the petition named John Moore as the real party in interest and failed to include Daniels, Baratta & Fine and its members as real parties in interest. USAA filed a motion to deem the caption of the petition to include Daniels, Baratta & Fine, a partnership, John P. Daniels, Inc., John P. Daniels, James M. Baratta, Paul R. Fine, Nathan B. Hoffman, Mary Hulett, James I. Montgomery, Jr., Lance D. Orloff, Mark R. Israel, and Michael N. Schonbuch as real parties in interest. The motion was opposed. The text of the petition makes it abundantly clear that the motion is meritorious, and the law permits such correction. (*Wilson v. Superior Court* (1964) 226 Cal.App.2d 715, 717, fn. 1 [38 Cal.Rptr. 255].) The motion was granted by order of this court filed on October 12, 2001.

[2]All further statutory references are to the Code of Civil Procedure.

be placed on all the payments of $4.5 million, for the purpose of establishing the credit to which the nonsettling defendant will be entitled, is only $1 million. In effect the settling parties agreed that the $3.5 million loan had no value to the settling plaintiffs. We hold that the settling parties failed to support this evaluation by substantial evidence. Therefore, the trial court erred in approving the settlement.

## BACKGROUND

On August 25, 1999, John Moore and Patricia Moore (the Moores) filed a complaint against DBF and its principals, and the Moores' insurer USAA. The complaint alleged two causes of action by John Moore against DBF for legal malpractice and breach of fiduciary duty, and one cause of action by the Moores against USAA for breach of the covenant of good faith and fair dealing. All three causes of action are predicated on the conduct of the defendants in an underlying action filed by Linda Wells and Rex Wells against Yamaha Manufacturing Motor Corporation (Yamaha) and John Moore (the Wells lawsuit). Before trial of the Wells lawsuit, the Moores discharged DBF (the law firm designated by the Moores' insurer, USAA, to defend them), engaged new attorneys and proceeded to trial. On July 29, 1999, judgment was entered against the Moores for $11,232,826. With accrued interest, the judgment represents a current obligation of at least $13 million. The essence of John Moore's claims against DBF is that it failed to inform, involve, or advise him about settlement offers in the Wells lawsuit until all offers had been rejected and withdrawn. The Moores' joint claim against USAA for bad faith is based on its failure to settle within policy limits. The complaint prayed for compensatory, general, and punitive damages. DBF and USAA answered, but neither filed a cross-complaint.

### The Settlement

On April 18, 2001, pursuant to section 877.6, counsel for DBF filed and served notice of motion for a determination that a settlement of the dispute between DBF and the Moores was made in good faith. The agreement provided that DBF's insurer, Reliance Insurance Company (Reliance), agreed to pay an aggregate of $4.5 million to be allocated among the Moores, the Wellses, and their respective attorneys. The terms of the payment called for a nonrecoverable payment of $1 million and a $3.5 million interest-free loan recoverable only from the proceeds of any settlement with or judgment against USAA. The agreement provides for the distribution of the settlement funds as follows:

(a) The first $1 million: $420,000 to Linda Wells; $280,000 to the Wellses' counsel in the underlying action, Stuart Fest (Fest); and $300,000 to the Moores.

(b) The remaining $3.5 million: $2.1 million to Linda Wells; $700,000 to Fest; and $700,000 to the Moores' counsel, Bishton & Gubernick.

Repayment of the $3.5 million loan is to be from any recovery against USAA by way of settlement or judgment and according to the following formula: The first $2 million of recovery will be paid to Reliance; from the next $3 million, $1.8 million will be paid to the Wellses, $600,000 to Fest, and $600,000 to Bishton & Gubernick. From the next $3 million, Reliance will be paid $1.5 million, and the remainder will be distributed, $900,000 to the Wellses, $300,000 to Fest, and $300,000 to Bishton & Gubernick. And from the next $2 million, the Wellses will be paid $900,000, the Moores will be paid $300,000, and Fest and Bishton & Gubernick will each be paid an additional $400,000. The agreement continues with provision for the division of any awards over and above the amounts stated. In summary, before Reliance can fully recover the $3.5 million loan, $8 million must be paid by way of a settlement with or judgment against USAA.

Other pertinent provisions of the settlement agreement are: (1) all of the terms and provisions of the settlement agreement are contingent on the court's determination that the settlement agreement is a "good faith" settlement pursuant to section 877 et seq.; (2) the Moores and DBF mutually agree to release each other from any and all claims; (3) the Moores and their counsel are obligated to prosecute the Moore case against USAA to a final judgment; (4) the assignment or settlement of the case for less than $13 million is prohibited without the prior written consent of the Moores, the Wellses, and their respective counsel; (5) DBF is obligated to appear for trial without subpoena and to produce originals of documents if required; and (6) the Moores and DBF agree that the credit value of the payments of $4.5 million is $1 million, establishing the offset against any judgment entered against USAA.

### The Motion for Good Faith Determination

A summary of the underlying Wells lawsuit is necessary to understand the trial court's determination. John Moore was the driver of a golf cart in which Linda Wells was a passenger. The golf cart turned over and Linda Wells sustained serious injuries. Linda Wells and her husband, Rex Wells, sued John Moore and the manufacturer of the golf cart, Yamaha. Moore tendered the defense and indemnity of the Wells lawsuit to his insurance carrier, USAA. USAA designated DBF to defend John Moore. Yamaha settled with the Wellses for $1 million. USAA declined to settle for the policy limits and, following trial, the Wellses recovered a judgment in excess of $11 million against John Moore.

DBF's motion for a determination that the settlement agreement was made in good faith was primarily supported by the declaration of one of its attorneys, Peter Ezzell. He represented that he is familiar with sliding scale settlements and has 29 years of experience as a trial lawyer. Further, he represented that he is thoroughly familiar with the background of these proceedings and the underlying matter, has directly participated in or reviewed all discovery, including the depositions of the expert witnesses, and has participated in four of the five mediated settlement conferences. Ezzell stated, "The largest problem for my clients was that their insurance carrier, Reliance Insurance Company, had its parent in supervision by the Pennsylvania Insurance Guaranty Association and there were strong indications that Reliance might fail at any moment. Reliance's policy was a total of $5,000,000 and I was also personally responsible for another claim [against DBF] within the same policy period."[3]

Ezzell expressed the opinion that DBF's exposure is 25 percent of the combined exposure "of the DB&F Defendants and USAA put together." His estimate discounted the $11 million plus interest ($13 million) exposure by 50 percent based on his assertion that "Mr. Moore's personal counsel [was] responsible for approximately one-half of the ultimate debacle." On that premise he concluded that DBF's exposure is 12.5 percent of $13 million. He, however, modified that conclusion by finally stating that "the $1,000,000 'up front money' and the $3,500,000 loan fall well within the 'ballpark' of a judgment of anywhere between $6,000,000 and $13,000,000 given my evaluation of 25 percent culpability of [DBF] compared to USAA."

Ezzell's estimation of DBF's potential proportionate liability was based on the fact that DBF informed USAA that Linda Wells was severely injured with medical expenses of approximately $100,000, the range of damages was between $600,000 and $800,000, and a net verdict would be in excess of the insurance policy limits. Ezzell also emphasized that DBF recommended USAA accept the Wellses' offer to settle for $100,000 and USAA declined to do so. Another factor on which Ezzell based his evaluation is that USAA

---

[3]The parties informed this court that on May 29, 2001, the Commonwealth Court of Pennsylvania ordered Reliance be placed into rehabilitation in accordance with the laws of Pennsylvania. The Pennsylvania court authorized the Insurance Commissioner of Pennsylvania to take immediate charge of Reliance's property, business, and affairs. The order also provides: "All actions currently pending in the Courts of the Commonwealth of Pennsylvania or elsewhere against an insured of Reliance are stayed for 60 days or such additional time as the Rehabilitator may request." No petition to stay these proceeding has been filed by or on behalf of any party to the Pennsylvania rehabilitation proceedings, nor would we be obligated to grant any such petition to stay.

did not disclose to the Moores that the limits of their insurance coverage exceeded $100,000; it was actually $200,000. Also, USAA instructed DBF to respond to an offer to settle for $100,000 "policy limits" with a counter-offer of $95,000, discounting $5,000 of medical payments, contrary to the terms of the insurance policy. When the Wellses became aware that coverage was $200,000, DBF again requested authority to make an offer of policy limits. USAA responded by authorizing only up to $165,000 and never offered policy limits prior to judgment. Thereafter, the Moores replaced DBF with new counsel who made a demand on USAA to settle for $1 million. USAA declined to do so, and an adverse judgment of more than $11 million was entered. In substance, Ezzell concluded these circumstances show that DBF is much less culpable than USAA.

Ezzell concluded "that the $1,000,000 'up front money' and the $3,500,000 loan fall well within the 'ballpark'" of DBF's proportionate share of liability. He also concluded, "the appropriate evaluation of the settlement is $1,000,000." Apparently this was based on his opinion that "the chances of the DB&F Defendants not receiving all of their loans back as approaching zero."

In points and authorities, DBF, joined by the Moores, urged that $1 million, that is, only the noncontingent portion of the payments made by Reliance, should be the credit afforded to USAA, the nonsettling defendant.

USAA opposed the motion on several grounds. As related to the present petition, USAA objected to Ezzell's declaration as conclusory and unsupported by any evidentiary showing of an equitable allocation of DBF's exposure or a fair basis for the $1 million evaluation of the credit. USAA also argued that the prohibition of any settlement with USAA for less than $13 million without the prior consent of the Moores, the Wellses, and their respective counsel is a veto power disallowed by *Abbott Ford, Inc. v. Superior Court* (1987) 43 Cal.3d 858, 883 [239 Cal.Rptr. 626, 741 P.2d 124].

The Moores joined DBF's reply and proposed that the valuation of the settlement may be increased by an additional $700,000 as a credit against any award of damages for attorney fees.

The trial court found that the settlement was made in good faith and that the $4.5 million is within the "ballpark." It also found that the $1 million valuation of the credit plus the $700,000 credit against an award of attorney fees damages complied with the requirements of *Abbott Ford*.

## DISCUSSION

USAA petitioned this court pursuant to section 877.6, subdivision (e), challenging the trial court's finding that the settling parties placed an

appropriate value on the contingent consideration. USAA further contends the provision of the settlement agreement prohibiting a settlement with USAA without the prior consent of the Moores, the Wellses, and their respective attorneys is an impermissible veto power. The issues presented do not include the allocation of proportionate liability or whether the "settlement is so far 'out of the ballpark' " as to be inconsistent with sections 877 and 877.6 and the holding of *Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499-500 [213 Cal.Rptr. 256, 698 P.2d 159].

### *Valuation of the Contingent Consideration*

A fundamental feature of a good faith settlement is allowing the nonsettling tortfeasor defendant a credit against any judgment taken against it to the extent of the value of the consideration paid by the settling tortfeasor. Section 877, subdivision (a) provides that a good faith settlement "shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater." This principle is equally applicable to a sliding scale recovery agreement. (§ .877.6.)

Here, the consideration included a $3.5 million loan that is repayable from the recovery against the nonsettling tortfeasor, USAA. A sliding scale settlement "includes, but is not limited to, . . . agreements in the form of a loan from the agreeing tortfeasor defendant or defendants to the plaintiff or plaintiffs which is repayable in whole or in part from the recovery against the nonagreeing tortfeasor defendant or defendants." (§ 877.5, subd. (b).)

The controlling authority for the resolution of whether the consideration paid by DBF is fairly valued is *Abbott Ford, Inc. v. Superior Court, supra,* 43 Cal.3d 858. *Abbott Ford* involved a personal injury action in which the plaintiffs sued Abbott Ford and two other tortfeasor defendants, Ford and Sears. Abbott Ford entered into a settlement contract with the plaintiffs, guaranteeing them a recovery of $3 million against Ford and Sears in exchange for a full dismissal of the claims against it. The terms of the agreement committed Abbott Ford to pay the full $3 million if the plaintiffs recovered nothing from the other defendants, or to make up the difference if the judgment was an amount less than $3 million.

Abbott Ford's exposure was contingent on the amount of damages awarded against the nonsettling defendants. The nonsettling defendants, Sears and Ford, argued that the value of the "consideration paid" should be calculated solely by reference to the noncontingent consideration paid under

the agreement. Because the agreement did not provide for any noncontingent payment, the nonsettling defendants argued that the "consideration" should be valued at zero. Abbott Ford, however, argued that it had guaranteed $3 million and the value of such consideration should be set at $3 million.

The *Abbott Ford* court addressed this conflict as follows: "The economic reality, we believe, lies between these two extreme positions. Contrary to the arguments of Ford and Sears, a guaranty agreement, even if totally contingent, is not completely cost-free from the point of view of the guarantor. At the same time and contrary to the position of Abbott, however, the 'cost' or 'price' of such an agreement is not equal to the maximum amount that the guarantor may possibly be required to pay under the agreement. Accordingly, given the nature of sliding scale agreements, we believe the court should not be burdened with the obligation to determine the *actual* value of such an agreement by the use of actuarial or other valuation methods. Rather, the parties to such an agreement, since they are in the best position to place a monetary figure on its value, should have the burden of establishing the monetary value of the sliding scale agreement." (*Abbott Ford, Inc. v. Superior Court, supra,* 43 Cal.3d at pp. 878-879.)

*Abbott Ford* states that "[o]nce the parties to the agreement have declared its value, a nonsettling defendant either (1) can accept that value and attempt to show that the settlement is not in good faith because the assigned value is not within the settling defendant's *Tech-Bilt* ballpark, or (2) can attempt to prove that the parties' assigned value is too low and that a greater reduction in plaintiff's claims against the remaining defendants is actually warranted." (*Abbott Ford, Inc. v. Superior Court, supra,* 43 Cal.3d at p. 879.)

By its terms, the DBF settlement agreement provides that on its execution by the parties and court approval, the $4.5 million must be paid to the plaintiffs. Of this, $1 million is a noncontingent payment, and $3.5 million is a contingent loan. As a condition to obtaining a court approval that the settlement is made in "good faith," a fair value must be assigned to the $3.5 million loan. The valuation placed on it by the parties to the settlement agreement is not substantiated by any analysis, evidence, or expert opinion.

At oral argument in this court, counsel for DBF essentially conceded that the noncontingent value of the $1 million payment was used to value the $3.5 million contingent consideration. He also asserted that $700,000 for attorney fee damages should be included in the valuation of the $3.5 million loan. That approach fails.

Applying the value of the noncontingent consideration to determine the value of the contingent consideration is too mechanical an approach to

demonstrate any real effort to realize a fair and equitable valuation. The incidental inclusion of a $700,000 credit dependent on attorney fee damages reinforces the conclusion that the purported valuation of the $3.5 million loan was simply robotic and not the product of negotiations intended to produce an equitable value of the contingent portion of the settlement.

 Sections 877 and 877.6 have two goals: "the equitable sharing of costs among the parties at fault and the encouragement of settlements. [Citation.] The provisions of section 877 make it quite clear that the two goals are inextricably linked. Section 877 establishes that a good faith settlement bars other defendants from seeking contribution from the settling defendant (§ 877, subd. (b)), but at the same time provides that the plaintiff's claims against the other defendants are to be reduced by 'the amount of consideration paid for' the settlement (§ 877, subd. (a)). Thus, while a good faith settlement cuts off the right of other defendants to seek contribution or comparative indemnity from the settling defendant, the nonsettling defendants obtain in return a reduction in their ultimate liability to the plaintiff." (*Abbott Ford, Inc. v. Superior Court, supra,* 43 Cal.3d at pp. 872-873, fn. omitted.)

In *Erreca's v. Superior Court* (1993) 19 Cal.App.4th 1475 [24 Cal.Rptr.2d 156], part of the consideration was the assignment of equitable indemnity rights. The settling defendants entered into a settlement agreement with the homeowners that called for the payment of $1.5 million and the assignment of their claims for equitable indemnity against the nonsettling defendants. Initially, a special master approved the settling parties' valuation of the $1.5 million at full face value and the assignment of equitable rights of indemnity at $300,000. He then, however, imposed a comparative fault analysis to reduce the valuation to $500,000 for both the $1.5 million and the assignment of equitable rights of indemnity. The trial court accepted his recommendation. (*Id.* at p. 1501.)

The appellate court directed the trial court to vacate its order unless it was modified to allow a $1.8 million credit to the nonsettling defendants. The *Erreca's* court found the valuation of the consideration was contrary to the "language in *American Motorcycle Assn. v. Superior Court* [(1978)] 20 Cal.3d [578,] 604 [146 Cal.Rptr. 182, 578 P.2d 899], where the Supreme Court discussed the public policy of section 877 in favor of settlement in the context of comparative equitable indemnity. The Supreme Court stated, 'Moreover, to preserve the incentive to settle which section 877 provides to injured plaintiffs, we conclude that a plaintiff's recovery from nonsettling tortfeasors should be diminished only by the amount that the plaintiff has

actually recovered in a good faith settlement, *rather than by an amount measured by the settling tortfeasor's proportionate responsibility for the injury.* [Citation.]' [Citation.] [¶] . . . [T]he amount the plaintiff recovers in a good faith settlement should be used to calculate the credit, rather than 'an amount measured by the settling tortfeasor's proportionate responsibility for the injury.' [Citation.] Thus . . . the $1.5 million soils allocation must be included as a whole in the amount of credit to be accorded nonsettling defendants against any future judgment." (*Erreca's v. Superior Court, supra,* 19 Cal.App.4th at pp. 1501-1502, italics added by the *Erreca's* court.) Also, the Court of Appeal approved of the parties' $300,000 valuation of the assignment of equitable indemnity rights, noting that the value of the assigned rights, a contingent asset, may be explained by declaration or by expert testimony. (*Id.* at p. 1497.)[4]

 The basic point of *Erreca's,* as applied to the present matter, is that the valuation of the settlement agreement must include the valuation of the contingent consideration paid to the settling plaintiff, supported by specific evidence, declaration, or opinion. (See also *Brehm Communities v. Superior Court* (2001) 88 Cal.App.4th 730 [105 Cal.Rptr.2d 918].) The determination of the "ballpark" generally establishes the valuation of the consideration, but because consideration may take many forms, its valuation may turn on a variety of factors. (*Erreca's v. Superior Court, supra,* 19 Cal.App.4th at p. 1503.) The issue here is similar to the valuation of the assignment of an intangible, because a $3.5 million loan repayable from a future judgment is a contingency dependent upon the probability of prevailing and, if so, in what amount. Although it is difficult to do, the $3.5 million loan must be evaluated.

DBF and the settling parties provide no meaningful analysis, expert opinion, or other evidence to support the $1 million valuation of the consideration. At oral argument in this court, DBF's counsel argued that *Abbott*

---

[4]In *Erreca's,* the court described how the settling parties proved the valuation of the assignment of the equitable rights of indemnity: "Here, in the developers' moving papers, they submitted a declaration by their attorney stating that the plaintiffs and developers agreed that the assigned claims were valued at $300,000, and explaining the basis for the valuation as a discount from the maximum $1.5 million entitlement to indemnity (this discount representing the cost to prosecute the claims, the probability of prevailing on them, and the likelihood of collecting on a judgment on them). The developers' attorney opined that it was likely they could prevail against [the nonsettling defendant] on a strict liability theory in the comparative equitable indemnity claim, but that because negligence would have to be proven as to [the additional nonsettling defendants], prevailing on those claims would be more difficult." (*Erreca's v. Superior Court, supra,* 19 Cal.App.4th at p. 1497.) Here, DBF failed to offer anything like a detailed and comparative analysis to explain to the court a justification for valuing the $3.5 million contingent consideration at, in effect, zero.

*Ford* does not hold that the noncontingent consideration may not be used as the basis for valuing the contingent consideration. On the contrary, *Abbott Ford* contemplated that the parties, through good faith negotiations and their conflicting self-interests, would produce a result that would allow the non-settling defendants a fair and equitable offset against any future judgment. In other words, the settling parties must engage each other in a meaningful effort to resolve the basic issues, including the valuation of the contingent consideration. But *Abbott Ford* did not endorse the formulistic and robotic approach employed here.

The inadequacy of the valuation is not salvaged by the proposal of the Moores' counsel to increase the ante by $700,000. He suggested below, "it might be appropriate for the Court to provide that USAA is entitled to a credit of $700,000 against any attorneys' fees awarded to Plaintiffs. Such a ruling would increase the possible credit to $1.7 million, and USAA's objection that *Abbott Ford* requires that the value of the offset should be something greater than the guaranteed payment in a sliding scale settlement would be met." The analysis is flawed because of the erroneous premise that attorney fee damages are recoverable in this action.

■ "When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss—damages—proximately caused by the tort. (*Mustachio v. Ohio Farmers Ins. Co.* [(1975)] 44 Cal.App.3d [358,] 363 [118 Cal.Rptr. 581].) These fees must be distinguished from recovery of attorney's fees *qua* attorney's fees, such as those attributable to the bringing of the bad faith action itself. . . . [¶] . . . [¶] '[W]hen the insurer's conduct is unreasonable, a plaintiff is allowed to recover for all detriment proximately resulting from the insurer's bad faith, which detriment *Mustachio* has correctly held includes those attorney's fees that were incurred to obtain the policy benefits and that would not have been incurred but for the insurer's tortious conduct.' [Citation.] The fees recoverable, however, may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract. Fees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable." (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817-819 [210 Cal.Rptr. 211, 693 P.2d 796], fn. omitted.)

■ The potential for recovery of damages for attorney fees to compel the insurer to provide benefits due under the policy is hardly demonstrated in the record. In fact, the only argument on this point states: "Under paragraph

1.A.(vi) of the Settlement Agreement, Plaintiffs' attorneys in the instant action will receive $700,000 in attorneys' fees from the amount lent to the Wells by Reliance. The Moores are seeking attorneys' fees from USAA under the authority of *Brandt v. Superior Court* . . . . If attorneys' fees are granted against USAA, it might be appropriate for the Court to provide that USAA is entitled to a credit of $700,000 against any attorneys' fees awarded to Plaintiffs." There is no explanation how *Brandt* applies to the facts of this case; the prospect of USAA benefiting from this ephemeral gesture is not discernible.

In summary, the valuation of the $3.5 million loan is simply unsupported and fails to comply with the equitable principles governing good faith settlements.

### *The Veto Provision*

USAA contends that the settlement agreement here includes a veto power that is disallowed in good faith settlements because it discourages future settlements with the nonsettling defendants. Its objection is articulated by the Supreme Court in *Abbott Ford*: "[T]he most obvious conflict between sliding scale agreements and a subsequent settlement of the balance of the lawsuit is posed by explicit provisions contained in most sliding scale agreements which purport to grant *the settling defendant* a 'veto power' over any subsequent settlement which would affect the settling defendant's ultimate out-of-pocket costs under the guaranty agreement. The provision contained in the agreement in the present case is fairly typical in this regard, providing that '[plaintiffs] shall not settle all or any portion of this litigation with defendants Ford and Sears Roebuck for less than the amount of [their] guarant[eed recovery], *without the express consent of [Abbott Ford's insurer]*.' " (*Abbott Ford, Inc. v. Superior Court, supra*, 43 Cal.3d 858, 882.)

The terms of the settlement agreement here between DBF and the Moores contain no such provision. The settlement agreement provides in relevant part that, "The Moores and Bishton.Gubernick, their attorneys, hereby agree to prosecute the Moore case against USAA to final judgment or settlement. Any assignment of the Moores' claims against USAA or any settlement with USAA in the Moore Case for less than Thirteen Million Dollars ($13,000,000) requires the prior written approval of the Moores, Bishton. Gubernick, the Wells and Stuart W. Fest, a Professional Corporation." Unlike *Abbott Ford*, neither DBF, the settling defendant, nor its insurer, Reliance, retained any right to veto or otherwise object to any settlement by any of the other parties.

It is only reasonable that the Moores and the Wellses and their respective attorneys would impose a collective veto power among themselves over the amount of the settlement with USAA. All of them have an interest in maximizing the recovery. Moreover, the Wellses have agreed to not seek recovery of their judgment from the Moores except from any recovery in the USAA case in accordance with the terms of the settlement agreement. Obviously, the Moores want to avoid an execution of the Wellses' judgment against their assets. The Moores are not going to settle for any amount that is not acceptable to the Wellses and thereby undermine the commitment of the Wellses to not execute on the Moores' property. It is apparent that the Moores and the Wellses have given their respective attorneys a stake in any settlement. If they choose to not settle unless their attorneys agree, that is a matter for them as clients to decide. Any conflict arising from that arrangement is not now evident and is hardly objectionable by USAA.

The *Abbott Ford* court was concerned about a different conflict involving the veto power of the settling defendants and their insurer. The veto power here is limited to the Moores, the Wellses, and their attorneys and does not include DBF or its insurer. It does not violate the holding of *Abbott Ford*.

### DISPOSITION

The order to show cause, having served its purpose, is discharged. Let a peremptory writ issue commanding respondent court to vacate its order approving the settlement. Costs are awarded to petitioner. (Cal. Rules of Court, rule 56.4.)

Epstein, J., and Curry, J., concurred.

Petitioner's petition for review by the Supreme Court was denied February 27, 2002.